UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.                                                     )<br>)<br>EDUARDO MONTAÑA,                  )<br>)<br>Defendant.                                    )<br>_____ ) | Crim. No. 18-10044-MPK |

## STATEMENT OF FACTS

In connection with the plea agreement between Defendant **EDUARDO MONTAÑA** ("**MONTAÑA**") and the United States in the above-captioned matter, **MONTAÑA** agrees the following facts are true and accurate.

1.  **MONTAÑA** is an individual residing in Atlanta, Georgia. Throughout 2013, **MONTAÑA** was a pediatric cardiologist licensed to practice medicine in Georgia and the CEO of Children's Cardiovascular Medicine, P.C. ("CCM"), which had a principal office in Marietta, Georgia. **MONTAÑA** shared ownership of CCM with a business partner (who was also a pediatric cardiologist) in 2013.

2.  In or around January 2013, **MONTAÑA** formed an entity named Cor2Life LLC ("Cor2Life"), which is a company registered in Delaware. The vision of Cor2Life was to "provide early detection, evaluation and treatment of defined personal and familial CV [*i.e.*, cardiovascular] risk factors to children and adolescents through consumer driven (family-based) population screening using innovative technology."

3.  In or around early February 2013, a drug sales representative ("Sales Rep") from Aegerion Pharmaceuticals, Inc. ("Aegerion") visited **MONTAÑA** at CCM to promote Aegerion's prescription drug Juxtapid. Juxtapid was indicated to treat adult patients with an ultra-rare genetic

1

disease called homozygous familial hypercholesterolemia ("HoFH"), which causes extremely high levels of LDL-C (also known as "bad" cholesterol). Juxtapid's FDA-approved prescribing information explicitly stated that Juxtapid's safety and effectiveness in pediatric patients had not been established. Despite Juxtapid's indication, the Sales Rep promoted the use of Juxtapid for some of **MONTAÑA**'s pediatric patients (whom **MONTAÑA** had not diagnosed as and did not believe to be HoFH patients but who were not responsive to other treatments) during the Sales Rep's visits and communications with **MONTAÑA** beginning in February 2013.

4. During one of the Sale Rep's follow-up visits with **MONTAÑA** in February 2013, **MONTAÑA** provided the Sales Rep with a six-page list, which was generated from a query on **MONTAÑA**'s electronic medical records ("EMR") system, of 280 dyslipidemia patients under **MONTAÑA**'s care. **MONTAÑA** had not diagnosed any of the patients on the list as having HoFH. This six-page list contained protected health information ("PHI"), under the Health Information Portability and Accountability Act ("HIPAA"), including names and dates of birth of all 280 patients, none of whom had authorized the disclosure of their PHI to the Sales Rep (or anyone else at Aegerion). Once the Sales Rep obtained the six-page list ("EMR query list"), the Sales Rep and **MONTAÑA** agreed that the Sales Rep would review the list to highlight the names of **MONTAÑA**'s dyslipidemia patients who were 16 years of age or older in order to identify patients for whom **MONTAÑA** might prescribe Juxtapid. It was **MONTAÑA**'s understanding that the Sales Rep would be providing administrative, time-saving assistance by filtering such patients based on their birthdates.

5. On February 26, 2013, the Sales Rep used a personal email account (rather than the Sales Rep's Aegerion email account, which the Sales Rep normally used to communicate with **MONTAÑA**) to send a color copy of the EMR query list to **MONTAÑA**. The Sales Rep had

highlighted in yellow the names of approximately 102 patients who were born in or after 1996 (*i.e.*, patients who were at least 16 years of age) on this color copy of the list. In the email, the Sales Rep commented that "it would be great to go over a case" the following day with an Aegerion senior executive (the "Executive"), whom **MONTAÑA** and the Sales Rep were scheduled to meet with on February 27, 2013. The Sales Rep concluded the email by stating: "By the way, I am sending this to you from my personal email because of the patient info :)".

6.      On February 27, 2013, the Executive, the Sales Rep, and **MONTAÑA** met in a small conference room within the condominium complex where **MONTAÑA** resided. During this meeting, the three of them sat around a small conference table on which the color copy of the EMR query list was presented and clearly visible to the three of them. The Executive, the Sales Rep, and **MONTAÑA** discussed the use of Juxtapid for **MONTAÑA's** pediatric patients, including several pediatric patients on the EMR query list, such as two sisters who were age 13 and 14 ("Patient A" and Patient B") whom **MONTAÑA** had not diagnosed as and did not believe to be HoFH patients but who had severe health problems and were not responding to other treatment methods. The Executive promoted the use of Juxtapid for Patient A, Patient B, and other pediatric patients not diagnosed with HoFH, including patients diagnosed with heterozygous familial hypercholesterolemia ("HeFH"), which is a less severe and much more prevalent disease than HoFH. During this discussion, the Executive confirmed **MONTAÑA's** understanding that some HeFH patients could benefit from Juxtapid and told **MONTAÑA** that other physicians had reached the same conclusion. It was always **MONTAÑA's** understanding that it was permissible for him to prescribe Juxtapid (or any drug) off-label based on his medical judgment. The Executive and **MONTAÑA** also discussed collaborative business opportunities, such as **MONTAÑA's** idea of population screening for dyslipidemia patients (beyond just HoFH patients) with support from

3

Aegerion. By the end of the meeting, the Executive and the Sales Rep had obtained Juxtapid prescriptions for Patient A and Patient B, which **MONTAÑA** signed on February 27, 2013. These two prescription forms contained PHI (patient names) disclosed to the Executive and the Sales Rep without patient authorization. Further, by the end of the meeting, the Executive, the Sales Rep, and **MONTAÑA** had agreed that the Sales Rep should continue to review **MONTAÑA**'s EMR data in order to filter patients for whom **MONTAÑA** might prescribe Juxtapid. Again, it was **MONTAÑA**'s understanding that the Sales Rep would be providing administrative, time-saving assistance by performing such filtering. **MONTAÑA** understood at all times that the Sales Rep would be reviewing the EMR data for the purpose of marketing Juxtapid.

7. At all times, **MONTAÑA** understood that the Executive and Sales Rep were marketing Juxtapid to him for their commercial gain; at all times, **MONTAÑA** understood that the Executive and the Sales Rep lacked clinical training or experience sufficient to assist him in making treatment decisions; and at no time did **MONTAÑA** intend to rely on the Executive or the Sales Rep in making clinical decisions about treatment of his patients.

8. From February 27, 2013, through around mid-March 2013, the Sales Rep initiated contact and followed up with **MONTAÑA** on multiple occasions to execute the EMR data review plan approved by the Executive. During this timeframe, **MONTAÑA** communicated with the Sales Rep on multiple occasions about **MONTAÑA**'s grant request to be submitted to Aegerion.

9. On March 18, 2013, **MONTAÑA** provided his personal EMR access password to the Sales Rep so that the Sales Rep could remotely access **MONTAÑA**'s EMR system and review his patients' PHI. Further, **MONTAÑA** and the Sales Rep exchanged multiple text messages that day in which **MONTAÑA** explained how to navigate his EMR system to review patient files. During this text exchange, the Sales Rep stated: "Aegerion is all about this so it will be great to

have hands on experience." The Sales Rep successfully accessed **MONTAÑA's** EMR system and reviewed PHI without patient authorization.

10. **MONTAÑA's** disclosure of his patients' PHI to the Sales Rep and the Executive in each instance described above was not permitted under CCM's Notice of Privacy Practices and CCM's patients' PHI-related consent forms.

11. On March 18, 2013, shortly after he provided his EMR access password to the Sales Rep, **MONTAÑA** submitted a grant proposal to Aegerion on behalf of his company Cor2Life requesting $236,000. **MONTAÑA's** grant proposal included a budget, which reflected that the majority of the requested $236,000 would fund "screening" costs, including the "Value Proposition-Sponsorship Opportunity" described as "IT Development of Cor2Life Website LIPID Module to identify homozygous FH, Heterozygous FH patient[s] through population screening." The budget further reflected that such screening was expected to generate income for Cor2Life, which was expected to cover various expenses, including a portion of **MONTAÑA's** salary. Aegerion ultimately declined **MONTAÑA's** grant request.

12. In January 2018, **MONTAÑA** agreed to provide truthful information to the government under the protections of a proffer letter (attached as <u>Addendum A</u>). During this proffer, **MONTAÑA** explained that he sought the $236,000 grant from Aegerion because he viewed the "population screening" idea as an opportunity to help an underserved population of children and to drive business into his practice. Further, **MONTAÑA** admitted that when he unlawfully disclosed and transferred PHI to the Executive and Sales Rep without patient authorization, his intent behind doing so was at least in part for Aegerion's commercial advantage and his own personal gain.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By: /s/
Young Paik
Kriss Basil
Assistant U.S. Attorneys

Dated: February 28, 2018

## Defendant's Acceptance of Factual Proffer

I have read this Statement of Facts and carefully reviewed every part of it with my attorney. I am fully satisfied with the legal advice provided by my attorney in connection with this Statement of Facts and all matters relating to it. I fully understand this Statement of Facts and voluntarily agree to it.

*[signature]*
Eduardo Montaña, M.D.
Defendant

Date: 2/28/18

## Defense Counsel's Acknowledgement

I am the attorney for Eduardo Montaña. I have reviewed every part of this Statement of Facts with him. It accurately sets forth the Statement of Facts agreed to by my client and United States Attorney's Office for the District of Massachusetts.

*[signature]*
T.C. Spencer Pryor, Esq.
Attorney for Defendant

Date: 2/28/18

7

# **ADDENDUM A**



**U.S. Department of Justice**

*Andrew E. Lelling*
*United States Attorney*
*District of Massachusetts*

*Main Reception: (617) 748-3100*

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

January 26, 2018

T.C. Spencer Pryor, Esq.
Alston & Bird LLP
One Atlantic Center
1201 West Peachtree Street, Suite 4900
Atlanta, GA 30309-3424

    Re:    <u>Dr. Eduardo Montaña</u>

Dear Counsel:

    This letter confirms that the United States Attorney for the District of Massachusetts will consider an accurate and complete proffer from your client, Dr. Eduardo Montaña, in connection with an investigation relating to Aegerion Pharmaceuticals, Inc. and/or the drug lomitapide (Juxtapid). The terms under which the contemplated proffer will be received are as follows:

    1.    No statements made or other information provided by Dr. Montaña will be used by the United States Attorney directly against him, except to rebut any evidence offered, or factual assertions made, by or on behalf of Dr. Montaña at any stage of a criminal or civil proceeding (including but not limited to detention hearing, trial or sentencing) which is inconsistent with, or contrary to statements made during the proffer, or in a prosecution of Dr. Montaña based on false statements made or false information provided by him.

    2.    The government may make derivative use of, or may pursue any investigative leads suggested by, any statements made or other information provided by Dr. Montaña in the course of the proffer. Any evidence directly or indirectly derived from the proffer may be used against him and others in any criminal case or other proceeding. This provision is necessary in order to eliminate the possibility of a hearing at which the government would have to prove that the evidence it would introduce is not tainted by any statements made or other information provided during the proffer. *See Kastigar v. United States*, 406 U.S. 441 (1972).

The United States Attorney is not hereby agreeing that he will subsequently enter into a plea or immunity agreement with your client. The foregoing is the complete agreement between your client and the United States Attorney with regard to your client's proffer.

Very truly yours,

ANDREW E. LELLING
United States Attorney

By: _____
Young Paik
Kriss Basil
Assistant U.S. Attorneys

Acknowledged and agreed to:

_____         1/26/18
Dr. Eduardo Montaña              Date

_____         1/26/18
T.C. Spencer Pryor               Date
Counsel for Dr. Eduardo Montaña

2