# Exhibit 1

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*



**U.S. Department of Justice**

*Andrew E. Lelling*
*United States Attorney*
*District of Massachusetts*

Main Reception: (617) 748-3100

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

November 19, 2019

To Whom It May Concern:

My name is Kriss Basil, and I am an Assistant United States Attorney for the District of Massachusetts. I write to inform you of Dr. Eduardo Montaña's cooperation with a criminal investigation of a pharmaceutical company in connection with his conviction for a misdemeanor violation of the Health Insurance Portability and Accountability Act ("HIPAA"), 42 U.S.C. § 1320d-6.

In 2018, prior to pleading guilty, Dr. Montaña assisted our investigation by providing information regarding his direct interactions with a senior executive and a sales representative from the pharmaceutical company. Dr. Montaña interpreted medical records, explained his clinical practice, and gave the government a detailed account of his conduct and the conduct of the pharmaceutical company's personnel. Dr. Montaña also assisted the United States by providing his opinion regarding the symptomology of a rare disease, the challenges of treating pediatric patients, and his views on the appropriate off-label uses of lipid-lowering therapies. In 2018, when providing information to the government, Dr. Montaña admitted his own guilt and accepted responsibility for his HIPAA violations.

Kriss Basil
Assistant U.S. Attorney

# Exhibit 2

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

1                    UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
2

3

4                                    )
    UNITED STATES OF AMERICA,        )
5                                    )
              Plaintiff,             )
6                                    )   Criminal Action
    v.                               )   No. 1:18-cr-10044-MPK-1
7                                    )
    EDUARDO MONTANA,                 )
8                                    )
              Defendant.             )
9                                    )


10

11              BEFORE THE HONORABLE M. PAGE KELLEY
                UNITED STATES MAGISTRATE JUDGE
12

13

                          SENTENCING
14

15
                      January 14, 2019
16

17

18           John J. Moakley United States Courthouse
                      Courtroom No. 24
19                    One Courthouse Way
                 Boston, Massachusetts 02210
20

21

22              Linda Walsh, RPR, CRR
                 Official Court Reporter
23       John J. Moakley United States Courthouse
              One Courthouse Way, Room 5205
24           Boston, Massachusetts 02210
                 lwalshsteno@gmail.com
25

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9

1    APPEARANCES:

2    On Behalf of the Government:

3         UNITED STATES ATTORNEY'S OFFICE
          By: AUSA Kriss Basil
4         One Courthouse Way
          Boston, Massachusetts 02210
5         617-748-3387
          kriss.basil@usdoj.gov

6

7    On Behalf of the Defendant:

8         ALSTON & BIRD, LLP
          By: T.C. Spencer Pryor, Esq.
9         1201 West Peachtree Street
          Atlanta, Georgia 30309-3424
10        404-881-7978
          spence.pryor@alston.com

11

12

13

14              Proceedings reported and produced
                 by computer-aided stenography
15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2           THE CLERK:  Today is Monday, January 14th, 2019, and
 3      we are on the record in Criminal Case Number 18-10044, the
 4      United States of America versus Eduardo Montana, the Honorable
 5      M. Page Kelley presiding.
 6           Would counsel please identify themselves for the
 7      record.
 8           MR. BASIL:  Good afternoon, Your Honor.  Kriss Basil
 9      for the United States.
10           THE COURT:  Good afternoon.
11           MR. PRYOR:  Good afternoon, Your Honor.  Spencer Pryor
12      on behalf of Dr. Eduardo Montana, who is here presently in
13      court today.  I apologize to the Court for my delay this
14      morning.  Thank you for your flexibility.
15           THE COURT:  No problem.  And good afternoon.
16           And good afternoon, sir.
17           THE DEFENDANT:  Good afternoon.
18           THE COURT:  So we are here for Dr. Montana's
19      sentencing, and I have read the presentence report.
20           Oh, there you are.  Hi.
21           U.S. PROBATION:  Hi, Your Honor.
22           THE COURT:  Do you want to just identify yourself for
23      the record.
24           U.S. PROBATION:  Yes.  Allyson Cormier from Probation.
25           THE COURT:  Thank you.
```

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9

1          So I read Ms. Cormier's presentence report as revised

2     through August of 2018; the plea agreement dated February 28th,

3     2018; the defendant's sentencing memorandum; and letters filed

4     on behalf of Dr. Montana.  And are there any other materials

5     that I should have looked at?

6          MR. BASIL:  Not from the Government, Your Honor.

7          MR. PRYOR:  Not from our side either, Your Honor.

8          THE COURT:  Okay.  So I think everyone had an

9     opportunity to look at the presentence report, and I will

10    address the objections to the presentence report; and just to

11    not waste anyone's time, I will adopt the parties' argument,

12    the Government and the defendant's, that the three

13    point -- that the three points that are in dispute should not

14    be applied.  I will say that I don't think they will affect the

15    sentencing.  They did not affect Probation's recommendation,

16    and I think the sentence here is within the range that those

17    three points would not really have mattered.

18          But I do find the facts of the case to be curious,

19    given that Dr. Montana was apparently at a table with

20    the -- you know, when he did reveal in his proffer that he was

21    there really kind of bargaining, it seems to me, for some

22    benefit from the company, and I think it would be a very close

23    case on those three points, but I don't think it matters here,

24    and I'm happy to adopt the parties' agreement that it does not

25    apply.  So I don't know that we need to hear argument on that

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

1  point.

2          MR. PRYOR:  We don't, Your Honor.

3          THE COURT:  Okay.  So in that case, the base offense

4  level under the guidelines is six, plus two for abuse of

5  position of trust, minus two for acceptance of responsibility.

6  That puts the guideline range at zero to six months, the

7  guideline fine range would be $1,000 to $9,500, no restitution,

8  and a $25 special assessment.  Any disagreement with that?

9          MR. PRYOR:  The only disagreement to that, Your Honor,

10 is that, as we noted in our sentencing memorandum, the proffer

11 guidelines for this offense, because of the date that it

12 occurred, actually should be the November 1, 2014 guidelines,

13 which, unless I'm mistaken, the low end of the fine guide range

14 would be $500 instead of $1,000.

15         THE COURT:  Oh, I see.  Okay.  Okay.  So it's $500

16 instead of $1,000 on the low end.

17         MR. PRYOR:  Yes, Your Honor.

18         THE COURT:  Anything from the Government on that?

19         MR. BASIL:  We agree.

20         THE COURT:  Okay.  All right.  So I'll hear from the

21 Government as to the Government's recommendation.

22         MR. BASIL:  Thank you, Your Honor.

23         The Government recommends in this case -- as you know,

24 there's a plea agreement, Your Honor.  We're going to recommend

25 at the low end, one year probation, $5,000 fine, and a $25

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9

1  special assessment.  The Government submits that this is

2  sufficient but not greater than necessary to achieve the goals

3  of Section 53(a) here for the following reasons.

4          Let me just start, very briefly, on the nature and

5  circumstances of the offense.  This is a case about patient

6  privacy.  Patients under HIPAA have a right to expect that

7  their doctors are going to keep their information private, and

8  in this case that expectation is heightened because the

9  patients involved are children, and it's parents who have their

10 children in the doctor's office expecting their children's

11 information to be kept private.  Patients need to be able to

12 trust their doctors and their doctors need to maintain the

13 trust of their patients, and Dr. Montana, as he admits, abused

14 that trust here.

15          In February 2013 what happened, as appears in the PSR,

16 Your Honor, is that drug salesmen showed up in Dr. Montana's

17 office.  They were there to sell their product, and what is not

18 clear from the PSR, but I'll just represent to the Court, it's

19 those drug salesmen were there that day as part of a sales

20 contest.  This wasn't about medicine.  This was about selling

21 product, and they were there that day to sell their product off

22 label.  This drug did not have a pediatric indication.

23          When Dr. Montana let these marketers in to his patient

24 files so that they could find patients to market the drug to on

25 a patient-by-patient basis, that was an abuse of trust.  But,

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9

```
 1    Your Honor, it is important to understand here that Dr. Montana
 2    did not go looking to do this.  They came to him.  That's the
 3    circumstances of this.  The overall context for this is a
 4    corporate effort to get this information from doctors, and
 5    Dr. Montana was swept up in that, and our recommendation seeks
 6    to recognize his role in this particular crime.
 7            With respect to the history and characteristics of
 8    this defendant, Your Honor, Dr. Montana has taken
 9    responsibility for his crime.  He has cooperated with the
10    Government.  He has been forthcoming in interviews.  He's
11    answered every question that I have put to him in what I
12    consider a forthright manner.  He has shown remorse and
13    expressed his remorse to us for what happened.  We believe that
14    with the special -- I should have noted as part of our
15    recommendation on the Probation, a special condition would be
16    that he complete additional HIPAA training reminding him of all
17    of his obligations.  We believe that with that, he will go back
18    into the community deterred, chastened with an adequate respect
19    for the law, proper respect for his responsibilities as an
20    attorney [sic].  For these reasons, Your Honor, for all these
21    reasons, we do not recommend a term of incarceration here.
22            THE COURT:  Okay.  Thank you.  I'll hear from
23    defendant counsel, yes.
24            MR. PRYOR:  Thank you, Your Honor.  I just want to
25    perhaps reiterate some of the comments that Mr. Basil has
```

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9

1  already made, but just to make sure the Court has an accurate
2  record of the facts and circumstances here.  First of all, as
3  Mr. Basil allowed, Dr. Montana has accepted full responsibility
4  for his actions.  He's cooperated with the Government's ongoing
5  investigation and will continue to do so as necessary.
6        Dr. Montana, as you probably gleaned from reading the
7  letters that were submitted on his behalf, is critical to the
8  well-being of his family and his community, and as Mr. Basil
9  indicated, he has no prior criminal history and is dedicated to
10  making sure that this is his last encounter with the criminal
11  justice system.
12        Also, I just want to point out to the Court, as you're
13  aware, that Dr. Montana has been under pretrial supervision
14  since February of 2018 and has fully complied with all the
15  requirements there.  And then, finally, as Mr. Basil referred
16  to, Dr. Montana -- a special condition of his probation being
17  HIPAA training for Dr. Montana, I'd just like to report to the
18  court, as we did in our memo, that to this end his practice,
19  Children's Cardiovascular Medicine, has engaged a HIPAA
20  consulting company which manages the portfolio of hundreds of
21  health care practices nationwide to conduct a HIPAA risk
22  assessment, analysis compliance training and monitoring.
23        And in addition to that, Dr. Montana proactively took
24  a number of other steps to correct his mistake.  First, he
25  reached out to the affected patients in his practice through

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9

1    notice letters in English and Spanish, and to this date his

2    practice is not aware of any patients' information was misused

3    or further disclosed.  Second, he reached out to other health

4    care providers that he knows and works with and explained the

5    situation and his role in hopes that they will learn from his

6    mistakes.  And third, as noted, he continues to improve his

7    understanding and knowledge of HIPAA.  He has already completed

8    two separate HIPAA seminars through the Health Care Compliance

9    Association.  Those are entitled:  The Elements of an Effective

10   HIPAA Privacy Program, which he completed in March of 2018,

11   shortly after entering the plea agreement, as well as HIPAA and

12   the Medical Practice:  Requirements for Privacy, Security and

13   Breach Notification in April of 2018.

14          With this in mind, Your Honor, we would respectfully

15   ask the Court to sentence Dr. Montana to a period of

16   noncustodial probation, and the low end of the fine range in

17   this matter, which is $500.  And, finally, what may be somewhat

18   of a unique request, but I will submit to the Court that this

19   is somewhat of a unique case, we would ask the Court to at

20   least consider giving Dr. Montana credit for the almost 11

21   months that he has successfully served on and been subjected to

22   pretrial supervised release.

23          THE COURT:  Okay.  And so what is your -- what is your

24   recommendation?

25          MR. PRYOR:  Well, our recommendation would be a

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9

1  probationary -- noncustodial probationary sentence for a period

2  of one year with credit given for the 11 months of pretrial

3  services supervision and a $500 fine.

4          THE COURT:  Okay.  So can I just ask you, what was the

5  purpose of having the drug company go through the records of

6  his patients?

7          MR. PRYOR:  The purpose of that was for the drug

8  company, in consultation with Dr. Montana -- well, excuse me.

9  For the drug company to identify potential patients that they

10  thought that their drug may be beneficial to, and then for

11  Dr. Montana to make a clinical decision, without input from the

12  drug company or the salesperson, as to whether or not their

13  drug that they were trying to market to him would be perhaps a

14  more effective treatment on patients that he's been treating

15  for a while that have not been improving on their current

16  treatment plan.

17          THE COURT:  And so they're going through the

18  records -- I thought in the statement of facts it was just to

19  point out that they were underage?

20          MR. PRYOR:  No.  They were going through -- per the

21  statement of facts, Your Honor, they were going through the

22  records to assist Dr. Montana in identifying patients that were

23  16 years or older because the drug was less problematic for

24  older patients.

25          THE COURT:  So their purpose in going through the

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9

1    records was just to pick out people who were over the age of

2    16?

3                MR. PRYOR:  And to identify them to him so that he

4    could make a clinical determination as to -- based on his

5    current treatment plan and their, you know, responsiveness or

6    lack of responsiveness to that plan, whether or not they would

7    be a good candidate for this drug.

8                THE COURT:  Yes?

9                MR. BASIL:  Your Honor.  The Government would put it

10   slightly differently.  The drug company was going through the

11   patient files in order to find patients so they could sell the

12   drug.  They were not simply going through and finding patients

13   who were 16 years or older.  In fact, they found patients who

14   were 13 and 14 and sought to put them on the drug.

15               Dr. Montana was relying on the drug company to provide

16   what he calls time-saving administrative assistance that

17   included contacting the patients -- and I'll note that I think

18   a total of six children received prescriptions.  Only one of

19   them actually got the drug.  Three of them were discontinued in

20   the company's patient records for what's called safety reasons,

21   and what that meant was that once the parents of these children

22   found out, they said no way.

23               So what was going on here, Your Honor, is the drug

24   company from their side was going through these records to find

25   patients so that they could get prescriptions filled and be

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9

1  paid.  That's what this is about.  That's why they came to

2  Dr. Montana, and that's what they were seeking to do.

3       THE COURT:  But as far as what Dr. Montana did, then

4  he exercised his own clinical judgment, but he did clear six

5  people that the drug company had pointed out to him might be

6  eligible and prescribed the medication for them?

7       MR. BASIL:  Yes.

8       THE COURT:  But then did any of them end up taking the

9  drug?

10      MR. BASIL:  One did, Your Honor.

11      THE COURT:  And is that person okay?

12      MR. BASIL:  That person, as I understand it, Your

13 Honor, that young woman, did in fact have an adverse event, and

14 Dr. Montana correctly and immediately took her off the drug.

15      THE COURT:  Okay.  Yes, sir?  I thought you were going

16 to say something.

17      MR. PRYOR:  No, I was just going to say I agree with

18 Mr. Basil.

19      THE COURT:  Okay.  Dr. Montana, would you like to

20 address the Court before the sentence is imposed?

21      THE DEFENDANT:  Yes.

22      THE COURT:  All right.  Please do.

23      THE DEFENDANT:  Good morning, Your Honor.

24      THE COURT:  Good morning.

25      THE DEFENDANT:  Your Honor, I stand before the Court

1   today humbled by this experience and with full remorse for my

2   actions.  From the bottom of my heart I regret the choices that

3   my actions have taken on my family, my practice and me

4   personally.  It has been a significant toll on my reputation

5   and my community that I serve because of this, and for that I'm

6   very, very sorry.  I practiced medicine for over 20 years with

7   folks, with children with heart conditions, and my life's work

8   has been devoted to help those who are less fortunate than

9   myself.

10          When Ms. Kelly came to my office, I truly believed I

11  would be getting time-saving assistance with a new drug that

12  could help my patients with this condition of dyslipidemia.  In

13  my excitement for this new treatment, I made a mistake, and I

14  disclosed information without permission.  I recognize the

15  error in my decisions and will never make the same mistake

16  again.  I have hired, as counsel said, an outside company to

17  ensure that my practice, which includes myself and all of my

18  staff, remain fully compliant with HIPAA and all privacy laws.

19          This is my first interaction with the criminal justice

20  system, and I am committed to make sure that it will be my

21  last.  I hope the Court understands that I would never

22  compromise my patients' care or safety, and I will never make

23  this mistake again.  Aside from being sorry for the legal

24  trouble I have caused myself, I deeply regret the pain and

25  suffering I have caused for my wife and my children and my

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9

14

1    family who have had to endure this with me.  It's the strength

2    in God and with their help that I have been able to get through

3    this.  And I ask for leniency with my sentencing.

4            Thank you very much.

5            THE COURT:  Okay.  So I will state formally the

6    sentence I'm going to impose and give my reasons, and when I am

7    done, I'll give the attorneys an opportunity to make any

8    objection.

9            So I'm not going to impose a sentence of

10   incarceration, and I think the Government recommendation is a

11   fair one.  I'm going to impose one year of probation, and I

12   will give Dr. Montana some credit because he's been on pretrial

13   supervision and I think it's very similar to the type of

14   supervision he will continue to be on, so I'm going to reduce

15   that time to six months of probation.  I'm going to impose a

16   $5,000 fine, and there will be a $25 special assessment.

17           And I do think this is a fair sentence, and it's

18   sufficient but not greater than necessary to comply with the

19   purposes of sentencing that's set out in the law.  I do give

20   the Government evaluation of the case some deference.  I know

21   they took a proffer and listened to Dr. Montana talk about the

22   circumstances of the offense.

23           I will say that it sounds to me like quite a serious

24   breach of his duties as a professional and as a caretaker of

25   his clients, his patients, to allow a time-saving effort on the

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9

1    part of someone who's going to make a great deal of money off

2    of selling him a drug to assist in any way with choosing people

3    to be on that drug, and I just think it's just a very serious

4    breach of his ethical duties.  I'm sure he's suffered a lot by

5    being charged with this and going through the prosecution, and

6    it sounds like he did everything right, and so good for him,

7    but I do think it's a serious offense.  So I don't know, is he

8    able to pay the fine immediately or should I set out some

9    conditions about paying it?

10            THE DEFENDANT:  I'll pay it.

11            THE COURT:  Okay.  So I'm going to say that's a lump

12   sum payment and it's due immediately; otherwise, there's a lot

13   of stuff about the schedule I need to set out.  There are

14   mandatory conditions of probation supervision that are very

15   similar to the conditions of release.

16            Dr. Montana cannot commit another federal, state or

17   local crime or unlawfully possess a controlled substance.  I'm

18   not going to impose any kind of drug testing.

19            The assessment has to be paid and the fine has to be

20   paid.  And there are other standard conditions for probation

21   that are set out in the Sentencing Guideline 5B1.3(c) that will

22   need to be complied with, and those will be set out in the

23   judgment.  So anything about the sentence?

24            MR. PRYOR:  Your Honor, if I could just -- sorry.

25            THE COURT:  No, go right ahead, sir.  That's it.

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

```
 1          MR. PRYOR:  If I could just briefly address the
 2   conditions of probation?
 3          THE COURT:  Yes.
 4          MR. PRYOR:  You probably remember that we had this
 5   similar conversation related to the conditions of supervised
 6   release, pretrial release.  And Dr. Montana travels
 7   internationally fairly frequently both for work and sometimes
 8   pleasure, oftentimes with his family.  He -- as was noted
 9   before, he is a dual citizen, United States of America as well
10   as Colombia, and he travels with his family fairly regularly
11   back to Colombia in an effort to, you know, let his children
12   experience the culture of his other home country as well as he
13   does work in Brazil and other areas related to --
14   medical-related work to serving underserved communities around
15   the world, Brazil, Africa and elsewhere.  And so, if possible,
16   we would request essentially the same terms and conditions that
17   were -- that he operated under during pretrial release.
18          THE COURT:  With regard to travel?
19          MR. PRYOR:  With regard to travel, yes, Your Honor.
20          THE COURT:  Do you recall what those were?
21          MR. PRYOR:  Yes, Your Honor, I do.  Essentially he has
22   not ever been ordered to surrender either of his passports, and
23   the conditions were not that he seek approval to travel
24   internationally but he simply inform his pretrial services
25   officer prior to traveling internationally where he was going
```

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

1    to go, the dates of the travel, and how he could be contacted,

2    if necessary, during his travel.

3              THE COURT:  Sure.  So we'll change C3, which says

4    "Defendant shall not knowingly leave the judicial district

5    without first getting permission."  We'll change that to just

6    "without first notifying the probation department."  Any

7    objection to that?

8              MR. BASIL:  No, Your Honor.

9              THE COURT:  And there's no requirement anywhere in

10   here that any passport would be surrendered.

11             MR. PRYOR:  Thank you, Your Honor.

12             THE COURT:  Okay.  And --

13             MR. BASIL:  Your Honor, it's clear that this is being

14   run out of Georgia, correct?

15             THE COURT:  Yes.  You will be supervised in the

16   Northern District of Georgia.

17             Okay.  So I think the only thing left is for me to

18   talk about the right to appeal.  So the plea agreement has some

19   waiver of appellate rights, sir, but I'm still going to advise

20   you of your right to appeal.  I don't mean to confuse you, but

21   I just want to do this as a precaution in case for some reason

22   your waiver of rights does not apply or is not effective, and

23   you will have to consult with an attorney to see if that's

24   true.  So if you have not waived it, you can appeal your

25   conviction if you think your guilty plea was unlawful or

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9

1    involuntary or there was some other fundamental defect in the

2    proceeding that was not waived by your guilty plea.  And if you

3    have not waived it, you have a right to appeal your sentence

4    under some circumstances, especially if you think it's contrary

5    to law, and you must file any notice of appeal within 14 days

6    after the entry of judgment, which I assume will be in the next

7    day or two.  And if you request, the clerk can immediately

8    prepare and file a notice of appeal on your behalf.  And,

9    again, I understand you've waived your right to appeal, but so

10   far as those rights are not waived, I am informing you of them.

11   Okay.

12            So is there anything further here.

13            MR. BASIL:  Not from the Government, Your Honor.

14            MR. PRYOR:  No, Your Honor.

15            THE COURT:  Okay.  So thank you very much.

16            MR. PRYOR:  Thank you.

17            THE CLERK:  Court is in recess.

18            (Adjourned, 12:35 p.m.)

19

20

21

22

23

24

25

```
1                    CERTIFICATE OF OFFICIAL REPORTER

2

3              I, Linda Walsh, Registered Professional Reporter

4    and Certified Realtime Reporter, in and for the United States

5    District Court for the District of Massachusetts, do hereby

6    certify that the foregoing transcript is a true and correct

7    transcript of the stenographically reported proceedings held in

8    the above-entitled matter to the best of my skill and ability.

9                   Dated this 23rd day of November, 2019.

10

11

12              /s/ Linda Walsh_____

13              Linda Walsh, RPR, CRR

14              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25
```

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

# Exhibit 3

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*



November 13th, 2019

***TO WHOM IT MAY CONCERN***
***OFFICE OF THE INSPECTOR GENERAL (OIG)***
***330 INDEPENDENCE AVENUE, SW***
***WASHINGTON, DC 20201***

Dear Sirs/Madams

This letter is written on behalf of Dr. Eduardo Montaña Jr., M.D., M.P.H., M.B.A., a respected physician in the State of Georgia with a solid reputation of providing pediatric cardiology, family preventive medicine and preventive cardiology services for the State's youth for over 25 years. Dr. Montaña has also involved himself in many regional federal initiatives to provide improved access and higher quality medical care to human trafficking survivors in the Metro Atlanta area.

Dr. Montaña has on several occasions over the past 5 years approached the Andrew J. Young Foundation with initiatives to provide basic primary and preventive health care to developing countries in Africa and Latin America. He tirelessly serves on the Board of My Sister's Place HT Inc, a non-profits serving victims of sexual assault, and rape at the HBCU campus.

Dr. Montana's contribution to the minority communities in Georgia is unparalleled and I do believe he would be an asset to the mission of My Sister's Place organization that the Andrew J Young Foundation has collaborated with for the past 10 years  For these reasons, I respectfully ask that the Office of the Inspector General consider approving Dr. Eduardo Montaña to work with any  Federal Health Care programs including Medicaid, Medicare, VA Health, Tricare, and CHAMPUS, allowing him to continue his community service with My Sister's Place.

Peace and Blessings

**Ambassador Andrew Young, Chairman**

**CC: Via E Mail angie.burnette@alston.com**
**Or Fax (404) 253-8283**
**Mrs. Angie Burnett Esq.**
**Alston Bird Attorneys**
**One Atlantic Center,**
**1201 W Peachtree St NE #4900,**
**Atlanta, GA 30309**

COMMUNICATING POSSIBILITIES
DEVELOPING LEADERS

Andrew J.Young Foundation, Inc. • 260 14th Sreet, NW • Atlanta, Georgia 30318
Phone: (404) 685-2786 Fax: (404) 685-2774 • www.andrewjyoungfoundation.org

Confidential Information-FOIA Exempt
OI File Number 1-13-40167-9

# Exhibit 4

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

The University of Georgia

College of Public Health
*Epidemiology and Biostatistics*

November 23, 2019

Office of the Inspector General
330 Independence Avenue, SW
Washington, DC 20201

Re: Dr. Eduardo Montaña

Dear Sir or Madam:

This letter is written on behalf of Dr. Eduardo Montaña Jr., M.D., M.P.H., M.B.A., a respected physician in the State of Georgia licensed since 1992 with a solid reputation of providing pediatric cardiology, family preventive medicine and preventive cardiology services for the State's youth for over 25 years.

I first met Dr. Montaña in 1994 when he was selected to join the Centers for Disease Control and Prevention as an Epidemiology Intelligence Service (EIS) fellow. This is a highly prestigious fellowship that train physicians and health scientists to become disease detectives and join the cadre of epidemiologists that tract and control disease worldwide, such as Ebola. Today, at the National level, EIS officers are conducting field work to understand how the vaping epidemic is leading to death and disability among adolescents and young adults and identify strategies to control this epidemic.

Dr. Montaña was assigned to the Division of Birth Defects and Developmental Disabilities, where I was the Associate Director for Science. At the time, joined EIS, the obesity epidemic among children in the United States was a major issue and the challenges of heart disease in children was a major concern. His experience at CDC led him into a lifelong career of addressing heart disease in children and particularly among children in minority and disadvantaged communities.

Following his arrival in the Division I moved to the National Immunization Program, where I served as Deputy Director and Assistant Surgeon General of the US Public Health Service. I continued to follow Dr. Montaña's very successful career in private practice where he became the local expert on obesity-related heart disease in children. This is an unattended area of pediatric cardiology in Atlanta and through the United States. During his 30+ years, he has become a recognized expert in pediatric cardiology, and has been involved in countless community and public health initiatives nationally and globally to address this public health challenge.

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9

His interest in the health of children and the realization of the importance of understanding policy development led to his interest in learning more about this important area.  For that reason he applied and was selected a Health Policy Fellowship program in Washington DC sponsored by the National Hispanic Health Associations (NHMA).  An example of his outstanding performance was his selection as NHMA Fellow of the Year. Dr. Montaña has shown a longstanding commitment to the health issues of minority Hispanic families.  He served for several years as NHMA conference leader with a focus on cardiovascular health in children.  He also served for two years on the National Hispanic Health Foundation (NHHHF) Board on the federal level advocating for improved access and quality of care for minority youth and their families.   During that time he also served in the Southeast affiliate organization to the NHMA, the Georgia Hispanic Health Coalition (GHHC) and for a 5-year term he was GHHC Chair of the Board.  Like NHMA/NHHF, the GHHC is a state organization with almost 30 years of history that was founded by Mercy Care, a division of St. Joseph's hospital in Atlanta, prior to their sale to Emory University.   GHHC gives this population a voice at the regional and national level as they participate in Health Policy discussions as the Southeast arm of the NHMA.

In summary, Dr. Montaña is a pillar in the Atlanta and Georgia Hispanic community as shown by his service to his patients and local community.  Loss of participation in from any Federal Health Care programs, such as  Medicaid, would significantly impact access to his services for many patients who are benefiting from his excellent pediatric cardiology services.

Sincerely,

José F. Cordero MD, MPH
Patel Distinguished Professor of Public Health
Department Head

# Exhibit 5

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

I

## CURRICULUM VITAE

# *Eduardo Montaña Jr., M.D., M.P.H., M.B.A.*

### Personal Information:

Date of Birth: December 22, 1962

Nationality: U.S. Birthplace: Virginia

República de Colombia

naturalized citizen though parents

Languages: English, Spanish, Portuguese

### Professional Roles:

CCM Global Health LLC – Atlanta, Ga
Chief Executive Officer, 2018- Present

Children's Cardiovascular Medicine – Atlanta, Ga
Executive Medical Officer,          2001-present

CIES Global – USA – Atlanta, GA/ São Paulo Brazil
Preventive Medicine Program (PMP)
Medical Director,                    2016-2018

Hispanic Health Care Coalition of Georgia -
Chairman, Board of Directors,    2012-2017

National Hispanic Health Foundation(NHHF) - Washington DC
Board of Directors,                  2013- 2017

National Hispanic Medical Association (NMHA) -Washington DC
Health Policy Fellow,                2012- 2013

Pediatrix Medical Group (NYSE)
West Palm Beach Pediatric Cardiology
Business Development          1998- 2001

Centers for Disease Control and Prevention, National Center for Environmental
Health – Epidemiology Intelligence Service Fellowship 1996-1998

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

2

Children's Heart Center
Department of Pediatrics
Emory University School of Medicine 1996-1998

## Community Initiatives

My Sister's Place; Human Trafficking Rescue - Atlanta, Ga & Miami Fla.
Board of Directors Member, 2017 - present

Morehouse School of Medicine; Sure Touch Tactile Digital Breast Scan
Initiative, Health Disparities Cancer Detection in Minority Women
Atlanta, Ga                    2017 - Present

Marietta High School Pinnacle Orthopedic Sports Screening
300 student athletes screened annually
Marietta, Ga 2017- 2019

CDC Foundation Grant; Control of Hypertension in Adult Hispanics.
Atlanta, Ga                    2016 – 2017

Salus-VideoMedicine – National Latino Telehealth Strategic Committee
Atlanta, Ga                    2015- 2016

Georgia State University; Center for Health Policy and State of Georgia, DHS;
Primary Care Steering Committee.
Atlanta, Ga                    2014-2015

State of Georgia, DHS; Office of the Governor
Chronic Disease Management Council
Atlanta, Ga                    2014 –2015

National Hispanic Alliance; Smoking Cessation Multi-Center Project;
National                    2013- 2015

American Heart Association, Southeast Regional Representative
Multi-Cultural Initiative.    2014-2016

Heart Screens for Teens – Sports Cardiac Screen 8000 athletes scanned over a
five-year period              2006-2010

## Professional Societies

American Academy of Pediatrics – Fellow        1992 – Present

Georgia Hispanic Chamber of Commerce HHCC – 2003 – Present

Hispanic Health Coalition of Georgia (HHCGA) –   2010- Present

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

3

| | |
|---|---|
| American College of Cardiology – | Fellow 1995 – Present |
| National Lipid Association – | Fellow 2009 – Present |
| National Hispanic Medical Association – | 2013 – Present |

**Professional Awards/Recognitions**

National Hispanic Medical Association (NHMA)
Health Policy Fellow of the Year                2017

Georgia Hispanic Chamber of Commerce (HHCGA)
Small Hispanic Business Owner of the Year       2016

University of San Francisco Quito
Award for Best Clinical Instructor              2008

Centers for Disease Control and Prevention, National Center for Environmental
Health – Epidemiology Intelligence Service Award for Outbreak Investigation,
Pulmonary Hemosiderosis, Cleveland Ohio         1998

Mercer University School of Medicine
American Medical Student Association Award      1988

**Academic Positions**

Pediatric Co-Editor, NextGen University
Virtual Health Sciences University              2008-2010

University of San Francisco School of Medicine
Academic Dean for International Students in USA
Quito, Ecuador                                  2006- present

Kennesaw University School of Nursing
Physician Preceptor for Advanced N.P.           2007 - Present

Emory University School of Medicine, Department of Pediatrics and Pediatric
Cardiology, Assistant Clinical Professor, Atlanta, Georgia.
                                                07/1996-6/1998

**EDUCATION:**
**Undergraduate**
**BS**- Emory University,                        8/1980-6/1984
Atlanta, Georgia

**Post Graduate- Masters**
**MPH-** Emory University School of Medicine,
Rollins School of Public Health
Atlanta, Georgia                                1984-1985

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

4

**MBA** University of Colorado,
Executive Health Administration,                    2008-2010

**Doctoral**
**MD**

Mercer University School of Medicine, M.D.          7/85-6/89
Macon, Georgia

**Postdoctoral-Clinical**
Pediatric **Internship**, University of Miami School of Medicine
Jackson Memorial Hospital, Miami, FL                7/89-6/90

Pediatric **Residency**, University of Miami School of Medicine
Jackson Memorial Hospital, Miami, FL                7/90-7/92

**Postdoctoral-Fellowship**
**Fellowship**, Pediatric Cardiology, Emory University School of
Medicine, Department of Pediatrics Atlanta, GA      7/92-6/96

**Fellowship,** Epidemiology Intelligence Service Officer, U.S. Centers for
Disease Control and Prevention, Birth Defects and Developmental Disabilities
Division, Genetics Epidemiology Branch, Atlanta, GA
                                                    6/94-6/96
**Fellowship,** Preventive Medicine, Department of Family and   6/11-5/13
Preventive Medicine, Emory University School of
Medicine, Atlanta, GA

**LICENSURE:**
Georgia          035954

**PREVIOUS CLINICAL/PROFESSIONAL APPOINTMENTS:**

Georgia Pediatric Cardiology-Northside Division, Partner and Medical Director,
10/00-01/04

Pediatric Cardiologist, Division of Pediatric Cardiology,
Pediatrix Medical Group., Inc. West Palm Beach, Florida
7/98-9/00

**MANUSCRIPTS:**

Montaña.E., Cuellar J.R., Cadle "Is Atherosclerosis a Pediatric Problem?"
Colombian Preventive Cardiology Journal, 2004.

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

5

Kaplan T, **Montaña E.** Exercise-induced bronchospasm in non-asthmatic obese children. Clinical Pediatrics, Volume 32, Number 4, April 93.

**Montaña E**, Etzel RA, Dearborn D. Environmental risk factors associated with Pediatric idiopathic pulmonary hemosiderosis in a Cleveland community. Submitted to *Pediatrics*, October 1995.

Etzel RA, **Montaña E**, Sorenson WG, Kullman GJ, Allan TJ. Acute pulmonary hemorrhage in infants associated with exposure to *Stachybotrys atra*. Submitted to *New England Journal of Medicine*, January 1996.

**Montaña E**, Khoury M, Cragan J, Sharma S, Dhar P, Fyfe D. The impact of fetal echocardiography on the diagnosis of congenital heart disease: a population based study, Atlanta, Georgia 1990-1994. Abstract accepted for American College of Cardiology Spring Meeting, March 1996, manuscript prepared for submission to Journal of the American College of Cardiology, Spring1996.

**Montaña E**, Khoury M, Yang Q, Campbell R, Jones DW, Dooley K. Thirty years trends of isolated and complex pulmonary atresia, Atlanta, Georgia. Manuscript in preparation, Centers for Disease Control and Prevention, Atlanta, Georgia, 1996.

Jason J, **Montaña E**, Inge L, Campbell R, Gregg L. Kawasaki's Disease and the T cell antigen receptor. Co-Investigator for manuscript in preparation, an ongoing collaborative study between the Center for Disease Control and The Children's Heart Center, Atlanta, Georgia, 1994.

Jason J, **Montaña E**, Hu A, Inge L, Campbell R. Immuno-regulatory changes in Kawasaki's Disease. Co-Investigator for manuscript in preparation, an ongoing collaborative study between the Center for Disease Control and The Children's Heart Center, Atlanta, Georgia, 1994.

## PRESENTATIONS:

**Montaña E.** Special Subject Expert, Latino Health Summit, Rollins School of Public Health, Cardiovascular Disease, Obesity and Diabetes- 6/2010

**Montaña E.** Strategic Vision for the Republic of Ecuador Health Infrastructure Reform, University of Denver; Executive MBA International Health Administration Program- January 2012

**Montaña E.** Global Summit to Combat Cardio-Metabolic Syndrome, Emory Halle Center for Global Learning – October 2011

**Montaña E.** Strategic Vision for the Republic of Ecuador Health Infrastructure Reform, Ministry of Health, Republic of Ecuador- Quito September 2011

**Montaña E.** Cardio-Metabolic Syndrome in Pediatric and Adolescent Patients;

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

6

Kennesaw State University Department of Graduate Nurses Program – February 2011

**Montaña E.** Cardio-Metabolic Syndrome in Pediatric and Adolescent Patients; Latin American Pediatric Association (ALAPE), Panama City Panama – March 2011

**Montaña E.** Cardio-Metabolic Syndrome in Pediatric and Adolescent Patients; Northside Hospital – Atlanta April  2011

**Montaña E.** Democratizing Knowledge: Health Sciences Online (HSO), University of San Francisco, June 2011

**Montaña E.** Trends in prenatal diagnosis using fetal echocardiography in well defined birth population, Atlanta, Georgia 1990-1994. American College of Cardiology Spring Meeting, Orlando, FL, March 1996.

**Montaña E.** The Epidemiology of Congenital Heart Disease in the Americas. Presented at the Cardiac Infant Foundation, Symposium PediatricCardiology, November 1995, Bogotá, Colombia.

**Montaña E,** The use of fetal echocardiography in the prenatal diagnosis and management of congenital heart disease. Presented at the Cardiac Infant Foundation, Symposium of Pediatric Cardiology, November 1995, Bogotá, Colombia.

**Montaña E,** Etzel RA, Dearborn D. Environmental risk factors associated with pediatric idiopathic pulmonary hemosiderosis in a Cleveland community. Abstract presentation at: Epidemiology Intelligence Service Conference, Centers for Disease Control and Prevention, April 1995, Atlanta, Georgia.

**Montaña E,** Etzel RA, Dearborn D. Environmental risk factors associated with pediatric idiopathic pulmonary hemosiderosis in a Cleveland community. Abstract presentation at: American Academy of Pediatrics, Subsection on Environmental Health, May, 1995, Charleston, South Carolina.

**Montaña E,** Etzel RA, Dearborn D. Environmental risk factors associated with pediatric idiopathic pulmonary hemosiderosis in a Cleveland community. Abstract presentation at: Society for Pediatric Epidemiology Research (SPER), June 1995, Snowbird, Utah.

**Montaña E,** Etzel RA, Dearborn D. Environmental risk factors associated with pediatric idiopathic pulmonary hemosiderosis in a Cleveland community. Abstract presentation at: Ohio Environmental Health Association Meeting, Keynote Address, October 1995, Cleveland, Ohio.

Grummerstrawn L, Stupps P, **Montaña E.** Determinants of Cause-Specific Child Mortality in Ecuador, Nicaragua, and El Salvador. Presentation at the Population Association of America Meeting, Miami, Florida, 1994.

<u>**Global Health and Prevention Activities:**</u>

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

7

Ecuador Ministry of Public Health/Social Security, acting consultant on a national health infrastructure reform providing "turn- key" solutions for addressing scarcity of health services, defining and addressing major public health concerns for region.

University of San Francisco _Quito Ecuador, Consultant for Health Care Administrative management and strategic planning for the regions first Health Maintenance Organization to address national reimbursement of private and public health universal coverage agenda.

EIS CDC Field Epi-Outbreak Guajira Colombia: Assessment of Teratogenic Effects of Venezuelan Equine Encephalitis Virus (VEE) on a population of 50,000 infected persons. Consultant for Republic of Colombia, Ministry of Health, Field Epidemiology Training Program in establishing birth defect surveillance in northern province La Guajira, November 1995.

EIS CDC Field Epi-Outbreak Cleveland Ohio: Assessment of outbreak of Pulmonary Hemosiderosis among infants' at Cleveland Children's Hospital. Field study of etiologies contributing to outbreak, media control, national surveillance monitoring, outbreak management

www.mychew.org A community portal for pediatric providers, patients and families to interact on issues related to evaluation, treatment, and health education for childhood obesity.

www.nextgenu.org World's first free internet based health sciences university, created first pediatric and adult cardiovascular prevention certificate offered globally to train health providers on obesity and diabetes prevention.

www.heartscreenforteens.com A national cardiovascular risk assessent program to screen high school athletes and at risk adolescents for principal causes of sudden cardiac death, cardio-metabolic risk, and obesity related CV risk factors.

**Contact Information:**

2896 Grandview Ave NE

Atlanta, Georgia 30305

Mobile + 404 213 6060

Work: + 404-943-0389

E Fax: + 470-235-4968

**E Mail:**  emontana@childrenscvm.com

**Skype:** eduardomontana1

**Websites:** www.childrenscvm.com
www.ciesglobalhealth.org

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

# Exhibit 6

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*



[Date]

**<u>VIA USPS MAIL</u>**
[Patient Name]
[Address]

Dear [Name]:

At Children's Cardiovascular Medicine (CCM), your privacy is important to us, and we wanted to let you know of an event involving some your medical information. We are still investigating the incident but we wanted to reach out now to those patients who we have determined may be involved.

CCM strives to provide its patients with quality care and innovative treatment when it is appropriate. In an effort to determine whether some patients might qualify for a new drug for treating certain high cholesterol conditions, a drug representative from a pharmaceutical company was given a list of patients who might qualify. You are receiving this letter because you or your child's name appeared on that list. Currently, we are not aware of any misuse of any patient's information.

The following types of information was involved: patient first and last name, date of birth, sex, address, phone number, medical record number, insurance carrier, and account number. Based on our review thus far, the records did <u>not</u> involve any credit card information, personal financial information, or Social Security Numbers.

Please know we take this matter seriously, and we are taking steps so this does not happen again. We are reviewing and improving our process and procedures. We are also providing additional training to all CCM staff who work with medical records. Given the limited nature of this disclosure, we are not aware of specific steps you should take to protect yourself. To date, we are not aware that any patient's information was misused or further disclosed.

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

If you have any questions about the incident, please contact me at (404) 943-0289 or emontana@childrenscvm.com. Thank you.

Sincerely,


_____

Dr. Eduardo Montaña
Executive Medical Officer
Children's Cardiovascular Medicine

LEGAL02/37920095v2

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

# Exhibit 7

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*



[Date]

**ENVIADO POR CORREO USPS**
[Patient Name]
[Address]

Estimado [Name]:

En Children's Cardiovascular Medicine (CCM), su privacidad es importante para nosotros, y queríamos informarle sobre un evento que involucra parte de su información médica.  Todavía estamos investigando el incidente, pero queríamos contactar los pacientes que hemos determinado que pueden estar involucrados.

CCM se esfuerza por brindar a sus pacientes atención de calidad y tratamiento innovador cuando sea apropiado.  En un esfuerzo por determinar si algunos pacientes podrían calificar para un nuevo medicamento para tratar ciertas condiciones de colesterol alto, un representante de medicamentos de una compañía farmacéutica recibió una lista de pacientes que podrían calificar.  Usted está recibiendo esta carta porque usted o el nombre de su hijo/hija aparecieron en esa lista.  Actualmente, no tenemos conocimiento de ningún mal uso de la información de ningún paciente.

Se incluyeron los siguientes tipos de información: nombre y apellido del paciente, fecha de nacimiento, sexo, dirección, número de teléfono, número de registro médico, compañía de seguros y número de cuenta.  Según nuestra revisión hasta el momento, los registros no incluían información de tarjeta de crédito, información financiera personal o números de seguro social.

Favor de tener en cuenta que tomamos este asunto en serio y estamos tomando medidas para que esto no vuelva a ocurrir.  Estamos revisando y mejorando nuestros procesos y procedimientos.  También proporcionamos capacitación adicional a todo el personal de CCM que trabaja con registros médicos. Dada la naturaleza limitada de esta divulgación, no conocemos los pasos específicos que debe tomar para

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

protegerse.  Hasta la fecha, no tenemos conocimiento de que la información de ningún paciente haya sido mal utilizada o revelada.

Si tienes cualquier pregunta sobre el incidente, favor de contactarme al (404) 943-0289 o emontana@childrenscvm.com. Gracias.

Muy atentamente,

_____

Dr. Eduardo Montaña
Oficial Ejecutivo Médico
Children's Cardiovascular Medicine

2

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9

# Exhibit 8

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*



PCIHIPAA

The HIPAA Quiz

Congratulations! You have passed the:

You are now ready to follow the guidelines outlined by the
**Health Insurance Portability and Accountability Act.**

Congratulations on passing the quiz. It is important we build a culture of compliance for our office.
Your successful completion of this quiz is a key step. If you have any questions, please contact your
HIPAA Security Officer or Supervisor. Thank you and Congratulations!

Sabrina Watts                                    Date Passed: 03/15/18

**Please print out this Certificate and share it with your Supervisor.**

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9



PCIHIPAA

# The HIPAA Quiz #2

Congratulations! You have passed the:

You are now ready to follow the guidelines outlined by the
**Health Insurance Portability and Accountability Act.**

Congratulations on passing the quiz. It is important we build a culture of compliance for our office.
Your successful completion of this quiz is a key step. If you have any questions, please contact your
HIPAA Security Officer or Supervisor. Thank you and Congratulations!

Sabrina Watts                                                    Date Passed: 03/30/18

**Please print out this Certificate and share it with your Supervisor.**

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9



Congratulations! You have passed the:

# The HIPAA Quiz

PCIHIPAA

You are now ready to follow the guidelines outlined by the
**Health Insurance Portability and Accountability Act.**

Congratulations on passing the quiz. It is important we build a culture of compliance for our office.
Your successful completion of this quiz is a key step. If you have any questions, please contact your
HIPAA Security Officer or Supervisor. Thank you and Congratulations!

Heidy Montana                                        Date Passed: 03/13/18

**Please print out this Certificate and share it with your Supervisor.**

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9



PCIHIPAA

# The HIPAA Quiz #2

Congratulations! You have passed the:

You are now ready to follow the guidelines outlined by the
**Health Insurance Portability and Accountability Act.**

Congratulations on passing the quiz. It is important we build a culture of compliance for our office.
Your successful completion of this quiz is a key step. If you have any questions, please contact your
HIPAA Security Officer or Supervisor. Thank you and Congratulations!

Heidy Montana                                    Date Passed: 03/15/18

**Please print out this Certificate and share it with your Supervisor.**

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9



PCIHIPAA

Congratulations! You have passed the:

# The HIPAA Quiz

You are now ready to follow the guidelines outlined by the
**Health Insurance Portability and Accountability Act.**

Congratulations on passing the quiz. It is important we build a culture of compliance for our office.
Your successful completion of this quiz is a key step. If you have any questions, please contact your
HIPAA Security Officer or Supervisor. Thank you and Congratulations!

Renee Brown

Date Passed: 03/15/18

**Please print out this Certificate and share it with your Supervisor.**

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9



PCIHIPAA

Congratulations! You have passed the:

**The HIPAA Quiz #2**

You are now ready to follow the guidelines outlined by the
**Health Insurance Portability and Accountability Act.**

Congratulations on passing the quiz. It is important we build a culture of compliance for our office.
Your successful completion of this quiz is a key step. If you have any questions, please contact your
HIPAA Security Officer or Supervisor. Thank you and Congratulations!

Renee Brown

Date Passed: 03/29/18

**Please print out this Certificate and share it with your Supervisor.**

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*



PCI·HIPAA™

Congratulations! You have passed the:

# The HIPAA Quiz

You are now ready to follow the guidelines outlined by the
Health Insurance Portability and Accountability Act.

Congratulations on passing the quiz. It is important we build a culture of compliance for our office.
Your successful completion of this quiz is a key step. If you have any questions, please contact your
HIPAA Security Officer or Supervisor. Thank you and Congratulations!

Michelle Siraco                                    Date Passed: 03/29/18

Please print out this Certificate and share it with your Supervisor.

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9



**PCIHIPAA**

Congratulations! You have passed the:

## The HIPAA Quiz #2

You are now ready to follow the guidelines outlined by the
**Health Insurance Portability and Accountability Act.**

Congratulations on passing the quiz. It is important we build a culture of compliance for our office.
Your successful completion of this quiz is a key step. If you have any questions, please contact your
HIPAA Security Officer or Supervisor. Thank you and Congratulations!

Michelle Siraco

Date Passed: 03/29/18

**Please print out this Certificate and share it with your Supervisor.**

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9



**PCIHIPAA**

Congratulations! You have passed the:

# The HIPAA Quiz

You are now ready to follow the guidelines outlined by the
**Health Insurance Portability and Accountability Act.**

Congratulations on passing the quiz. It is important we build a culture of compliance for our office.
Your successful completion of this quiz is a key step. If you have any questions, please contact your
HIPAA Security Officer or Supervisor. Thank you and Congratulations!

Susana Arellano                                        Date Passed: 03/15/18

Please print out this Certificate and share it with your Supervisor.

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9



PCIHIPAA

Congratulations! You have passed the:

# The HIPAA Quiz #2

You are now ready to follow the guidelines outlined by the **Health Insurance Portability and Accountability Act.**

Congratulations on passing the quiz. It is important we build a culture of compliance for our office. Your successful completion of this quiz is a key step. If you have any questions, please contact your HIPAA Security Officer or Supervisor. Thank you and Congratulations!

Susana Arellano                                          Date Passed: 03/15/18

**Please print out this Certificate and share it with your Supervisor.**

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9



Congratulations! You have passed the:

## The HIPAA Quiz

You are now ready to follow the guidelines outlined by the
**Health Insurance Portability and Accountability Act.**

Congratulations on passing the quiz. It is important we build a culture of compliance for our office.
Your successful completion of this quiz is a key step. If you have any questions, please contact your
HIPAA Security Officer or Supervisor. Thank you and Congratulations!

Maggie Foda                                          Date Passed: 04/16/18

Please print out this Certificate and share it with your Supervisor,

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9



Congratulations! You have passed the:

## The HIPAA Quiz #2

You are now ready to follow the guidelines outlined by the
**Health Insurance Portability and Accountability Act.**

Congratulations on passing the quiz. It is important we build a culture of compliance for our office.
Your successful completion of this quiz is a key step. If you have any questions, please contact your
HIPAA Security Officer or Supervisor. Thank you and Congratulations!

Maggie Foda                                    Date Passed: 04/16/18

**Please print out this Certificate and share it with your Supervisor.**

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

# Exhibit 9

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9

Children's Cardiovascular Medicine
## Acknowledgment of Opportunity to Review HIPAA Policies and Procedures

I, Eduardo Montana Jr., have been given the opportunity to review, read and understand Children's Cardiovascular Medicine's HIPAA Policies and Procedures Manual. I agree to abide by the policies and procedures stated therein during my employment with Children's Cardiovascular Medicine. I understand that these policies and procedures are subject to change, and my immediate supervisor may inform me of such changes. I also acknowledge that I am required to participate in training on the HIPAA Policies and Procedures. If I fail to adhere to the Policies and Procedures set forth in the Manual, Children's Cardiovascular Medicine may impose discipline on me, up to and including termination.

As part of my employment with Children's Cardiovascular Medicine I may be asked to handle information which contains Protected Health Information ("PHI") or electronic Protected Health Information ("ePHI"). I understand that before I may access such PHI, it is necessary for me to sign this form and acknowledge the following:

* My role and responsibilities associated with handling PHI or ePHI as part of my job functions;
* My use of only the minimum necessary PHI or ePHI to complete any given task;
* My responsibility to report any known or suspected mishandling or unauthorized use of PHI or ePHI; and
* The sanctions that may be imposed for the mishandling or unauthorized use of PHI or ePHI

_____          03/13/2018
Employee Signature                     Date

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9

Children's Cardiovascular Medicine

## Acknowledgment of HIPAA Training

I, Eduardo Montana Jr. , certify that I have received and understand Children's Cardiovascular Medicine s HIPAA training materials. I agree to comply with the material that I have been trained on concerning the handling of an individual's Protected Health Information ("PHI") and electronic Protected Health Information ("ePHI"). I recognize the importance of maintaining the confidentiality and integrity of PHI that I handle as part of my job duties. I understand that as part of my employment with Children's Cardiovascular Medicine , I must handle PHI and ePHI according to Children's Cardiovascular Medicine's training materials and policies and procedures.

*Eduardo Montana Jr.*                    03/13/2018

Employee Signature                          Date

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9

## Acknowledgment of Opportunity to Review HIPAA Policies and Procedures

I, <u>Sabrina Watts</u> , have been given the opportunity to review, read and understand Childrens Cardiovascular Medicine's HIPAA Policies and Procedures Manual. I agree to abide by the policies and procedures stated therein during my employment with Childrens Cardiovascular Medicine. I understand that these policies and procedures are subject to change, and my immediate supervisor may inform me of such changes. I also acknowledge that I am required to participate in training on the HIPAA Policies and Procedures. If I fail to adhere to the Policies and Procedures set forth in the Manual, Childrens Cardiovascular Medicine may impose discipline on me, up to and including termination.

As part of my employment with Childrens Cardiovascular Medicine I may be asked to handle information which contains Protected Health Information ("PHI") or electronic Protected Health Information ("ePHI"). I understand that before I may access such PHI, it is necessary for me to sign this form and acknowledge the following:

- My role and responsibilities associated with handling PHI or ePHI as part of my job functions;
- My use of only the minimum necessary PHI or ePHI to complete any given task;
- My responsibility to report any known or suspected mishandling or unauthorized use of PHI or ePHI; and
- The sanctions that may be imposed for the mishandling or unauthorized use of PHI or ePHI

Employee Signature                                    3-15-18

Employee Signature                                    Date

## Acknowledgment of HIPAA Training

I, <u>Sabrina Watts</u> , certify that I have received and understand Childrens Cardiovascular Medicine s HIPAA training materials. I agree to comply with the material that I have been trained on concerning the handling of an individual's Protected Health Information ("PHI") and electronic Protected Health Information ("ePHI"). I recognize the importance of maintaining the confidentiality and integrity of PHI that I handle as part of my job duties. I understand that as part of my employment with Childrens Cardiovascular Medicine , I must handle PHI and ePHI according to Childrens Cardiovascular Medicine's training materials and policies and procedures.

_____
Employee Signature

3-15-18
_____
Date

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9

## Acknowledgment of Opportunity to Review HIPAA Policies and Procedures

I, <u>Heidy Tellez-Montana</u>, have been given the opportunity to review, read and understand Childrens Cardiovascular Medicine's HIPAA Policies and Procedures Manual. I agree to abide by the policies and procedures stated therein during my employment with Childrens Cardiovascular Medicine. I understand that these policies and procedures are subject to change, and my immediate supervisor may inform me of such changes. I also acknowledge that I am required to participate in training on the HIPAA Policies and Procedures. If I fail to adhere to the Policies and Procedures set forth in the Manual, Childrens Cardiovascular Medicine may impose discipline on me, up to and including termination.

As part of my employment with Childrens Cardiovascular Medicine I may be asked to handle information which contains Protected Health Information ("PHI") or electronic Protected Health Information ("ePHI"). I understand that before I may access such PHI, it is necessary for me to sign this form and acknowledge the following:

- My role and responsibilities associated with handling PHI or ePHI as part of my job functions;
- My use of only the minimum necessary PHI or ePHI to complete any given task;
- My responsibility to report any known or suspected mishandling or unauthorized use of PHI or ePHI; and
- The sanctions that may be imposed for the mishandling or unauthorized use of PHI or ePHI

_(signature)_           03/13/2018

Employee Signature               Date

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

## Acknowledgment of HIPAA Training

I, <u>Heidy Tellez-Montana</u> , certify that I have received and understand Childrens Cardiovascular Medicine s HIPAA training materials. I agree to comply with the material that I have been trained on concerning the handling of an individual's Protected Health Information ("PHI") and electronic Protected Health Information ("ePHI"). I recognize the importance of maintaining the confidentiality and integrity of PHI that I handle as part of my job duties. I understand that as part of my employment with Childrens Cardiovascular Medicine , I must handle PHI and ePHI according to Childrens Cardiovascular Medicine's training materials and policies and procedures.

_____                    03/13/2018
Employee Signature                                          Date

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

## Acknowledgment of Opportunity to Review HIPAA Policies and Procedures

I, Renee Brown , have been given the opportunity to review, read and understand Childrens Cardiovascular Medicine's HIPAA Policies and Procedures Manual. I agree to abide by the policies and procedures stated therein during my employment with Childrens Cardiovascular Medicine. I understand that these policies and procedures are subject to change, and my immediate supervisor may inform me of such changes. I also acknowledge that I am required to participate in training on the HIPAA Policies and Procedures. If I fail to adhere to the Policies and Procedures set forth in the Manual, Childrens Cardiovascular Medicine may impose discipline on me, up to and including termination.

As part of my employment with Childrens Cardiovascular Medicine I may be asked to handle information which contains Protected Health Information ("PHI") or electronic Protected Health Information ("ePHI"). I understand that before I may access such PHI, it is necessary for me to sign this form and acknowledge the following:

- My role and responsibilities associated with handling PHI or ePHI as part of my job functions;
- My use of only the minimum necessary PHI or ePHI to complete any given task;
- My responsibility to report any known or suspected mishandling or unauthorized use of PHI or ePHI; and
- The sanctions that may be imposed for the mishandling or unauthorized use of PHI or ePHI

_____                    3·14·2018
Employee Signature                                  Date

## Acknowledgment of HIPAA Training

I, <u>Renee Brown</u>, certify that I have received and understand Childrens Cardiovascular Medicine s HIPAA training materials. I agree to comply with the material that I have been trained on concerning the handling of an individual's Protected Health Information ("PHI") and electronic Protected Health Information ("ePHI"). I recognize the importance of maintaining the confidentiality and integrity of PHI that I handle as part of my job duties. I understand that as part of my employment with Childrens Cardiovascular Medicine , I must handle PHI and ePHI according to Childrens Cardiovascular Medicine's training materials and policies and procedures.

_____
Employee Signature

3. 14. 2018
Date

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9

Childrens Cardiovascular Medicine

## Acknowledgment of Opportunity to Review HIPAA Policies and Procedures

I, Michelle Siraco , have been given the opportunity to review, read and understand Childrens Cardiovascular Medicine's HIPAA Policies and Procedures Manual. I agree to abide by the policies and procedures stated therein during my employment with Childrens Cardiovascular Medicine. I understand that these policies and procedures are subject to change, and my immediate supervisor may inform me of such changes. I also acknowledge that I am required to participate in training on the HIPAA Policies and Procedures. If I fail to adhere to the Policies and Procedures set forth in the Manual, Childrens Cardiovascular Medicine may impose discipline on me, up to and including termination.

As part of my employment with Childrens Cardiovascular Medicine I may be asked to handle information which contains Protected Health Information ("PHI") or electronic Protected Health Information ("ePHI"). I understand that before I may access such PHI, it is necessary for me to sign this form and acknowledge the following:

- My role and responsibilities associated with handling PHI or ePHI as part of my job functions;
- My use of only the minimum necessary PHI or ePHI to complete any given task;
- My responsibility to report any known or suspected mishandling or unauthorized use of PHI or ePHI; and
- The sanctions that may be imposed for the mishandling or unauthorized use of PHI or ePHI

Employee Signature

Date 3/14/18

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9

Childrens Cardiovascular Medicine

## Acknowledgment of HIPAA Training

I, Michelle Siraco , certify that I have received and understand Childrens Cardiovascular Medicine s HIPAA training materials. I agree to comply with the material that I have been trained on concerning the handling of an individual's Protected Health Information ("PHI") and electronic Protected Health Information ("ePHI"). I recognize the importance of maintaining the confidentiality and integrity of PHI that I handle as part of my job duties. I understand that as part of my employment with Childrens Cardiovascular Medicine , I must handle PHI and ePHI according to Childrens Cardiovascular Medicine's training materials and policies and procedures.

_____
Employee Signature

3. 14 18
Date

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

## Acknowledgment of Opportunity to Review HIPAA Policies and Procedures

I, Susana Arellano , have been given the opportunity to review, read and understand Childrens Cardiovascular Medicine's HIPAA Policies and Procedures Manual. I agree to abide by the policies and procedures stated therein during my employment with Childrens Cardiovascular Medicine. I understand that these policies and procedures are subject to change, and my immediate supervisor may inform me of such changes. I also acknowledge that I am required to participate in training on the HIPAA Policies and Procedures. If I fail to adhere to the Policies and Procedures set forth in the Manual, Childrens Cardiovascular Medicine may impose discipline on me, up to and including termination.

As part of my employment with Childrens Cardiovascular Medicine I may be asked to handle information which contains Protected Health Information ("PHI") or electronic Protected Health Information ("ePHI"). I understand that before I may access such PHI, it is necessary for me to sign this form and acknowledge the following:

- My role and responsibilities associated with handling PHI or ePHI as part of my job functions;
- My use of only the minimum necessary PHI or ePHI to complete any given task;
- My responsibility to report any known or suspected mishandling or unauthorized use of PHI or ePHI; and
- The sanctions that may be imposed for the mishandling or unauthorized use of PHI or ePHI

_____
Employee Signature

3.14.18
Date

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9

## Acknowledgment of HIPAA Training

I, Susana Arellano , certify that I have received and understand Childrens Cardiovascular Medicine s HIPAA training materials. I agree to comply with the material that I have been trained on concerning the handling of an individual's Protected Health Information ("PHI") and electronic Protected Health Information ("ePHI"). I recognize the importance of maintaining the confidentiality and integrity of PHI that I handle as part of my job duties. I understand that as part of my employment with Childrens Cardiovascular Medicine , I must handle PHI and ePHI according to Childrens Cardiovascular Medicine's training materials and policies and procedures.

Employee Signature                                    3.14.18
                                                      Date

## Acknowledgment of Opportunity to Review HIPAA Policies and Procedures

I, Maggie Foda , have been given the opportunity to review, read and understand Childrens Cardiovascular Medicine's HIPAA Policies and Procedures Manual. I agree to abide by the policies and procedures stated therein during my employment with Childrens Cardiovascular Medicine. I understand that these policies and procedures are subject to change, and my immediate supervisor may inform me of such changes. I also acknowledge that I am required to participate in training on the HIPAA Policies and Procedures. If I fail to adhere to the Policies and Procedures set forth in the Manual, Childrens Cardiovascular Medicine may impose discipline on me, up to and including termination.

As part of my employment with Childrens Cardiovascular Medicine I may be asked to handle information which contains Protected Health Information ("PHI") or electronic Protected Health Information ("ePHI"). I understand that before I may access such PHI, it is necessary for me to sign this form and acknowledge the following:

- My role and responsibilities associated with handling PHI or ePHI as part of my job functions;
- My use of only the minimum necessary PHI or ePHI to complete any given task;
- My responsibility to report any known or suspected mishandling or unauthorized use of PHI or ePHI; and
- The sanctions that may be imposed for the mishandling or unauthorized use of PHI or ePHI

Employee Signature

3/14/18

Date

## Acknowledgment of HIPAA Training

I, Maggie Foda , certify that I have received and understand Childrens Cardiovascular Medicine s HIPAA training materials. I agree to comply with the material that I have been trained on concerning the handling of an individual's Protected Health Information ("PHI") and electronic Protected Health Information ("ePHI"). I recognize the importance of maintaining the confidentiality and integrity of PHI that I handle as part of my job duties. I understand that as part of my employment with Childrens Cardiovascular Medicine , I must handle PHI and ePHI according to Childrens Cardiovascular Medicine's training materials and policies and procedures.

_____
Employee Signature

3|14|18
Date

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9

# Exhibit 10

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

Children's Cardiovascular Medicine
# Employee Access to PHI Policy

## Purpose
To ensure that **Children's Cardiovascular Medicine**'s workforce members have the appropriate level of access to electronic Protected Health Information* ("ePHI").

## Policy

I. **Children's Cardiovascular Medicine** will enact safeguards to protect against reasonably anticipated uses or disclosures of PHI that are not permitted or required by the Privacy Rule.

II. **Children's Cardiovascular Medicine** will ensure that its workforce members* have appropriate access to ePHI.

III. **Children's Cardiovascular Medicine** will ensure that workforce members who are prohibited from accessing ePHI do not have access to such information.

    A. For purposes of this policy, "workforce member" is defined as an employee, volunteer, trainee, or other person whose conduct, in the performance of work for Children's Cardiovascular Medicine, is under the direct control of Children's Cardiovascular Medicine, whether or not they are paid by Children's Cardiovascular Medicine. See HIPAA Glossary.

## Procedure

I. **Workforce Member Access Authorization**

    A. The HIPAA Security Officer will work with team members to determine the level of access to PHI and ePHI that is appropriate for each staff member to carry out his/her job function.

        i. For example, The Owners of Children's Cardiovascular Medicine will most likely require a high level of access to ePHI maintained by Children's Cardiovascular Medicine. A member of Children's Cardiovascular Medicine's secretarial staff may not require any level of access in order to carry out his/her job function

    B. The HIPAA Security Officer will document each workforce member's approved level of access. Form A – Employee Security Clearance.

    C. The HIPAA Security Officer will implement the appropriate technical restrictions on each workforce member's workstation* and username to ensure that the workforce member only accesses ePHI which he/she is authorized to access.

    D. The HIPAA Security Officer will periodically review each workforce member's access authorization level, and will modify the level of access as necessary.

    E. The HIPAA Security Officer will periodically monitor the activity of each workforce member's username and workstation to ensure that the appropriate level of security is maintained.

II. **Termination of Workforce Member**

    A. When a workforce member is terminated, the HIPAA Security Officer will ensure that his/her access to Children's Cardiovascular Medicine's information technology system is immediately terminated.

    B. The HIPAA Security Officer or his or her designee may be required to do one or more of the following:

        i. De-activate the workforce member's workstation username;

        i. Prohibit the workforce member from accessing his/her email account for Children's Cardiovascular Medicine; and

        ii. Retrieve any portable electronic devices or storage devices the workforce member has in his/her possession that are the property of Children's Cardiovascular Medicine.

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

Children's Cardiovascular Medicine

# Employee Access to PHI Policy

---

**References**

**Sources:**

I.  45 CFR §§160.502; 160.401-160.404; National Labor Relations Act §7.

**Forms:**

**Version No.** 1.0                                    **Date revised:**

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

**Children's Cardiovascular Medicine**

## Business Associates Policy

**Purpose**

To describe the obligations of business associates and the requirements for contracting with business associates.

**Policy**

I. Definition of business associate:

   A. Children's Cardiovascular Medicine will consider any vendor or independent contractor a business associate if it is not a member of Children's Cardiovascular Medicine's workforce and meets one of the following criteria:

      i. Creates, receives, maintains or transmits Protected Health Information (PHI) for any of the following purposes: claims processing or claims administration; data analysis, processing, or administration; utilization review; quality assurance; patient safety activities; billing; benefit management; practice management; or repricing; or

      ii. Provides legal, actuarial, accounting, consulting, data aggregation, management, administrative, accreditation, or financial services to or for Children's Cardiovascular Medicine, or to or for an organized health care arrangement in which Children's Cardiovascular Medicine participates, where the provision of the service involves the disclosure of PHI from Children's Cardiovascular Medicine or from another business associate of Children's Cardiovascular Medicine.

   B. Postal and courier services, janitors, electricians and other contractors that act as a conduit for PHI, whose work does not involve the use or disclosure of PHI, and who may only have incidental access to PHI are not considered business associates.

   C. If a contractor is hired to perform a project for Children's Cardiovascular Medicine where it is provided with direct access to Children's Cardiovascular Medicine's PHI, such as shredding or destroying documents with PHI, the contractor will be treated as a business associate.

II. Children's Cardiovascular Medicine will obtain satisfactory assurances that a business associate will appropriately safeguard Children's Cardiovascular Medicine's PHI by requiring the business associate to sign a Business Associate Agreement.

III. If a business associate of Children's Cardiovascular Medicine discloses Children's Cardiovascular Medicine's PHI to a subcontractor*, the business associate must obtain satisfactory assurances that the subcontractor will appropriately safeguard Children's Cardiovascular Medicine's PHI by requiring the subcontractor to sign a Business Associate Agreement.

   A. A subcontractor is defined as a person to whom a business associate delegates a function, activity, or service other than in the capacity of a member of the workforce of such business associate. See *HIPAA* Glossary.

IV. The HIPAA Security Officer will monitor the behavior of the Children's Cardiovascular Medicine's business associates with respect to the use and disclosure of PHI, and will report any conduct that appears inappropriate to Owner (s).

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

# Exhibit 11

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*



# Certificate of Completion

The HIPAA Group, Inc. hereby presents

**Basic HIPAA Privacy & Security**

Sabrina Watts
*of*

*With this Certificate, in recognition of successful completion of this program*

*Awarded this date: December 09, 2016*

HIPAA Group Training Officer

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9



# Certificate of Completion

## Basic HIPAA Privacy & Security

The HIPAA Group, Inc. hereby presents

### Heidy Montana

of

*With this Certificate, in recognition of successful completion of this program*
*Awarded this date: November 23, 2016*

_____
HIPAA Group Training Officer

The HIPAA Group

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*



# Certificate of Completion

**Basic HIPAA Privacy & Security**

The HIPAA Group, Inc. hereby presents

**Renee Brown**

of

*With this Certificate, in recognition of successful completion of this program*
*Awarded this date: November 29, 2016*

HIPAA Group Training Officer

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9



Certificate of Completion

Basic HIPAA Privacy & Security

The HIPAA Group, Inc. hereby presents

Michelle Siraco

of

Awarded this date: November 21, 2016

With this Certificate, in recognition of successful completion of this program

HIPAA Group Training Officer

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9



# Certificate of Completion

## Basic HIPAA Privacy & Security

The HIPAA Group, Inc. hereby presents

### Susana Arellano

of

*With this Certificate, in recognition of successful completion of this program*
*Awarded this date: November 28, 2016*

HIPAA Group Training Officer

The HIPAA Group

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9

# Exhibit 12

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

# ALSTON & BIRD

One Atlantic Center
1201 West Peachtree Street
Atlanta, GA  30309-3424
404-881-7000 | Fax: 404-253-8283

Angela T. Burnette                    Direct Dial:  404-881-7665              Email:  angie.burnette@alston.com

March 7, 2018

PRIVILEGED AND CONFIDENTIAL
VIA EMAIL TO lhughes@dch.ga.gov & HAND DELIVERY

LaSharn Hughes, MBA
Interim Executive Director
Georgia Composite Medical Board
2 Peachtree Street, NW, 36th Floor
Atlanta, GA 30303-3465

Re:   Eduardo Montaña, Jr., M.D.
        Georgia License # 35954

Dear Ms. Hughes:

*Please see the information below, which is respectfully submitted on behalf of Dr. Montaña regarding his recent misdemeanor plea involving HIPAA. As discussed below, he did not intend to violate any law or do anything inappropriate, and he has taken numerous proactive steps to address the matter. We look forward to working with the Board and resolving this matter with you. Thank you.*

Eduardo Montaña, Jr. is a pediatric cardiologist who is licensed in Georgia (license number 35954) in good standing.  He has practiced in the Atlanta area for over 20 years and is board certified.  The majority of Dr. Montaña's patients are from underserved minority populations with complex medical problems. In order to better serve his pediatric patients, Dr. Montaña recently completed a residency in Preventative Medicine at Emory University and is particularly interested in research and innovative treatment options for young patients with significant cardiovascular risk factors including complex lipid disorders.

Many of Dr. Montaña's patients suffer from dyslipidemias, which are elevated total cholesterol levels of different type, including elevated LDL (bad) cholesterol levels, elevated Triglycerides, or low HDL (good) cholesterol levels.  While some of these patients respond to conventional treatment, a number of his patients have not. Compounding the

Alston & Bird LLP                                                                              www.alston.com

Atlanta  |  Beijing  |  Brussels  |  Charlotte  |  Dallas  |  Los Angeles  |  New York  |  Raleigh  |  San Francisco  |  Silicon Valley  |  Washington, D.C.

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

March 7, 2018                                                    PRIVILEGED AND CONFIDENTIAL
Page 2

challenges to treating these pediatric patients with dyslipidemia is the fact that a limited number of prescription medications have been approved for pediatric patients.

In early February 2013, Dr. Montaña first met with a sales representative from Aegerion Pharmaceuticals Inc. ("Aegerion"). The Aegerion sales representative was promoting a drug, Juxtapid, which could be prescribed off-label for pediatric patients to treat HoFH (homozygous familial hypercholesterolemia), an inherited disorder that can lead to premature and aggressive cardiovascular disease. Patients taking Juxtapid are required to adhere to a low-fat diet in order to minimize side effects, and Aegerion offered any patient taking Juxtapid access to a registered dietician to assist in customizing an eating plan. At that time, Dr. Montaña was having difficulty in his efforts to hire a good dietician to assist with the nutritional counseling for his pediatric patients.

The Aegerion sales representative offered to help Dr. Montaña identify patients who could benefit from Juxtapid. She could work with patients to complete the necessary paperwork and assist patients and their families in navigating the various benefits, like access to a registered dietician, from Aegerion. The Aegerion sales representative made it clear that she was contacting other doctors in the area and was offering to provide the same services to those doctors. It was Dr. Montaña's understanding that the Aegerion sales representative would be providing administrative assistance, which would allow him to spend more of his time with patients.

Over several weeks, Dr. Montaña provided the Aegerion sales representative with printed results of an electronic medical record query that listed his patients with an ICD-9 code consistent with dyslipidemias. The printout included names, addresses, dates of birth, and medical record numbers of those patients. The printout did not contain any SSNs, financial information, or other medical information. Dr. Montaña's goal in providing this information to the Aegerion sales representative was to improve patient care by obtaining assistance from an individual who was familiar with Juxtapid in identifying which of his patients might benefit from the drug. Unfortunately, Dr. Montaña did not obtain patient authorization to share this information. Ultimately, only five established patients were ever considered by Dr. Montaña for the drug.

In late February 2013, Dr. Montaña met with the Aegerion sales representative and an Aegerion executive. Dr. Montaña relayed his interest in using his non-profit organization to screen children in underserved populations for dyslipidemias, and Aegerion informed him that they had a program that offered grants to physicians for such purposes. Dr. Montaña also discussed a few of his patients previously identified on the above-referenced EMR query who could benefit from the drug at that meeting. Dr. Montaña also issued two prescriptions for Juxtapid -- for two specific patients in his practice based on their clinical condition -- and he provided the prescriptions to the Aegerion representatives at the meeting for proper submission to a pharmacy. Dr. Montaña did not obtain patient authorization to share this information. Neither of these two patients that were prescribed Juxtapid ever took the drug.

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

March 7, 2018                                                    PRIVILEGED AND CONFIDENTIAL
Page 3

After the meeting, and at the Aegerion sales representative's request, Dr. Montaña provided her with his login and password for remote access into his electronic medical record system so she could further assist him in identifying patients who could benefit from the drug. As part of his efforts to provide cardiovascular risk screening to disadvantaged populations, Dr. Montaña also applied for a grant from Aegerion to cover costs of screening more children from underserved minority populations for lipid disorders. ***Dr. Montaña never received the grant or any money at all from the pharmaceutical company.*** Throughout 2013 and into 2014, Dr. Montaña considered participating in drug trials related to Juxtapid. He ultimately declined, informing Aegerion that he did not have enough qualifying patients to justify participation in the trial. Overall, only one of Dr. Montaña's patients ever took the drug as prescribed by him, and this patient briefly took Juxtapid for a couple of weeks before deciding to stop due to nausea and diarrhea.

The United States Attorney's Office for the District of Massachusetts ("USAO") began investigating Aegerion. Dr. Montaña became aware that his conduct was also being investigated in 2017. Dr. Montaña has fully cooperated in that investigation and has provided the USAO with critical information about Aegerion, the Aegerion executive he met with and the Aegerion sales representative. As a result of the USAO's investigation, Dr. Montaña pled guilty to a single count underlined misdemeanor HIPAA violation on February 28, 2018. He has an ongoing cooperation agreement with the USAO, has testified before the grand jury, and will continue to assist in their investigation and the potential prosecution of the Aegerion executives. The government is not recommending any jail time as part of Dr. Montaña's sentence. In short, he recognized his mistake, has taken responsibility for his actions and is working to rectify that mistake.

Dr. Montaña is a compassionate doctor who cares deeply for his patients and tries to provide the best care possible with his limited resources. He was presented with the hope of a new treatment for his pediatric patients who had not responded to conventional treatments. While there are no allegations that Dr. Montaña's actions negatively affected patient care, in retrospect, Dr. Montaña realizes that in his overzealousness to find a new treatment for these patients, he improperly shared patient information with Aegerion. Dr. Montaña is remorseful for his actions and is committed to maintaining a HIPAA compliant practice in the future. To that end, Dr. Montaña's practice, Children's Cardiovascular Medicine, has engaged PCIHIPAA, a HIPAA consulting company which manages a portfolio of hundreds of health care practices nationwide, to conduct a HIPAA risk assessment and analysis, HIPAA compliance training and monitoring for his practice. These services provided by PCIHIPAA will begin immediately.

This incident has deeply affected Dr. Montaña, his wife and their four children as well as his practice. Although a small subset of patients' clinical data was accessed in hopes of trying to provide a cutting edge drug to treat his patients, there have been many sleepless nights as Dr. Montaña has repeatedly thought about the choices he now regrets.

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

March 7, 2018                                                PRIVILEGED AND CONFIDENTIAL
Page 4

Moving forward, he has taken responsibility and several proactive steps to correct the matter. First, he is reaching out to affected patients in his practice through notice letters in English and Spanish; to date, his practice is not aware that any patient's information was misused or further disclosed. Second, he is reaching out to other health care providers and explaining the situation and his role. Third, the practice's HIPAA procedures are in the process of being reviewed and improved. Fourth, while he still maintains an office practice for pediatric cardiology, Dr. Montaña has also traveled to Boston to cooperate with the government in their investigation of Aegerion. Fifth, Dr. Montaña continues to improve his understanding and knowledge of HIPAA; he will be completing two separate HIPAA seminars through the Health Care Compliance Association: The Elements of an Effective HIPAA Privacy Program (March 2018); and HIPAA & The Medical Practice: Requirements for Privacy, Security and Breach Notification (April 2018).

      Dr. Montaña sincerely regrets his actions. At the time, he did not intend, in any way, to violate any law or do anything inappropriate. He is committed to protecting patient information, and his practice will work hard to carefully maintain the privacy of such information. He assures the Georgia Medical Board that this will not ever happen again.

Sincerely,

*Angela Burnette*

Angela T. Burnette

cc: Eduardo Montaña, Jr., M.D.

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9

# Exhibit 13

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9

# Georgia Composite Medical Board



**Interim Executive Director**
LaSharn Hughes, MBA

**Chairperson**
E. Daniel DeLoach, MD, FACS
**Vice Chairperson**
John Jeffery Marshall, MD

2 Peachtree Street, NW • 6th Floor • Atlanta, Georgia 30303 • (404) 656-3913 • www.medicalboard.georgia.gov

April 13, 2018

Eduardo Montana, Jr., MD
780 Canton Road, NE
Suite 3
Marietta, Georgia 30060

Re: Self-Reported Conviction

Dear Dr. Montana:

The Georgia Composite Medical Board has completed its investigation of the complaint it received regarding the medical care and treatment you provided to the above-referenced patient.

The Board voted to close this case and to take no disciplinary action. However, the Board does wish to express to you its concern regarding abide by HIPPA regulations.

Please note that under Georgia law, O.C.G.A. § 43-1-19(j), a letter of concern, such as this, shall not be considered a disciplinary action or a contested case and shall not be disclosed by the Board to any person except you. You are not required to disclose this letter to any entity. If you have additional questions at this time, please contact Patricia Sherman, Enforcement Manager at 404-657-6487 or by email at patricia.sherman@dch.ga.gov.

Sincerely,

LaSharn Hughes, MBA

Interim Executive Director

LH/lb

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

# Exhibit 14

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9

# ALSTON & BIRD

One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309-3424
404-881-7000 | Fax: 404-253-8660

Dawnmarie R. Matlock                Direct Dial: 404-881-4253              Email: dawnmarie.matlock@alston.com

March 7, 2018

**VIA COURIER**

Mr. Blake T. Fulenwider
Deputy Commissioner, Georgia Medicaid Chief
Georgia Department of Community Health
2 Peachtree Street, NW, 36th Floor
Atlanta, GA 30303

**VIA OVERNIGHT DELIVERY**

HPES Provider Enrollment
100 Crescent Centre Pkwy., Suite 1100
Tucker, Georgia 30084-7039

Re:   Eduardo Montaña, Jr., M.D.
      Georgia Medicaid Provider Number 000712962Y

Dear Mr. Fulenwider:

*Please see the information below, which is respectfully submitted on behalf of Dr. Montaña regarding his recent misdemeanor plea involving HIPAA. As discussed below, he did not intend to violate any law or do anything inappropriate, and he has taken numerous proactive steps to address the matter. We look forward to working with you to resolve this matter. Thank you.*

Eduardo Montaña, Jr. is a pediatric cardiologist who is licensed in Georgia in good standing. He has practiced in the Atlanta area for over 20 years and is board certified. The majority of Dr. Montaña's patients are from underserved minority populations with complex medical problems. In order to better serve his pediatric patients, Dr. Montaña recently completed a residency in Preventative Medicine at Emory University and is particularly interested in research and innovative treatment options for young patients with significant cardiovascular risk factors including complex lipid disorders.

Alston & Bird LLP                                                                                           www.alston.com

Atlanta | Beijing | Brussels | Charlotte | Dallas | Los Angeles | New York | Raleigh | San Francisco | Silicon Valley | Washington, D.C.

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

March 7, 2018
Page 2

Many of Dr. Montaña's patients suffer from dyslipidemias, which are elevated total cholesterol levels of different type, including elevated LDL (bad) cholesterol levels, elevated Triglycerides, or low HDL (good) cholesterol levels.  While some of these patients respond to conventional treatment, a number of his patients have not.  Compounding the challenges to treating these pediatric patients with dyslipidemia is the fact that a limited number of prescription medications have been approved for pediatric patients.

In early February 2013, Dr. Montaña first met with a sales representative from Aegerion Pharmaceuticals Inc. ("Aegerion").  The Aegerion sales representative was promoting a drug, Juxtapid, which could be prescribed off-label for pediatric patients to treat HoFH (homozygous familial hypercholesterolemia), an inherited disorder that can lead to premature and aggressive cardiovascular disease.  Patients taking Juxtapid are required to adhere to a low-fat diet in order to minimize side effects, and Aegerion offered any patient taking Juxtapid access to a registered dietician to assist in customizing an eating plan.  At that time, Dr. Montaña was having difficulty in his efforts to hire a good dietician to assist with the nutritional counseling for his pediatric patients.

The Aegerion sales representative offered to help Dr. Montaña identify patients who could benefit from Juxtapid.  She could work with patients to complete the necessary paperwork and assist patients and their families in navigating the various benefits, like access to a registered dietician, from Aegerion.  The Aegerion sales representative made it clear that she was contacting other doctors in the area and was offering to provide the same services to those doctors. It was Dr. Montaña's understanding that the Aegerion sales representative would be providing administrative assistance, which would allow him to spend more of his time with patients.

Over several weeks, Dr. Montaña provided the Aegerion sales representative with printed results of an electronic medical record query that listed his patients with an ICD-9 code consistent with dyslipidemias. The printout included names, addresses, dates of birth, and medical record numbers of those patients.  The printout did not contain any SSNs, financial information, or other medical information. Dr. Montaña's goal in providing this information to the Aegerion sales representative was to improve patient care by obtaining assistance from an individual who was familiar with Juxtapid in identifying which of his patients might benefit from the drug.  Unfortunately, Dr. Montaña did not obtain patient authorization to share this information.  Ultimately, only five established patients were ever considered by Dr. Montaña for the drug.

In late February 2013, Dr. Montaña met with the Aegerion sales representative and an Aegerion executive.  Dr. Montaña relayed his interest in using his non-profit organization to screen children in underserved populations for dyslipidemias, and Aegerion informed him that they had a program that offered grants to physicians for such purposes. Dr. Montaña also discussed a few of his patients previously identified on the above-referenced EMR query who could benefit from the drug at that meeting. Dr. Montaña also issued two prescriptions for Juxtapid -- for two specific patients in his

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

March 7, 2018
Page 3

practice based on their clinical condition -- and he provided the prescriptions to the Aegerion representatives at the meeting for proper submission to a pharmacy. Dr. Montaña did not obtain patient authorization to share this information. Neither of these two patients that were prescribed Juxtapid ever took the drug.

After the meeting, and at the Aegerion sales representative's request, Dr. Montaña provided her with his login and password for remote access into his electronic medical record system so she could further assist him in identifying patients who could benefit from the drug. As part of his efforts to provide cardiovascular risk screening to disadvantaged populations, Dr. Montaña also applied for a grant from Aegerion to cover costs of screening more children from underserved minority populations for lipid disorders. *Dr. Montaña never received the grant or any money at all from the pharmaceutical company.* Throughout 2013 and into 2014, Dr. Montaña considered participating in drug trials related to Juxtapid. He ultimately declined, informing Aegerion that he did not have enough qualifying patients to justify participation in the trial. Overall, only one of Dr. Montaña's patients ever took the drug as prescribed by him, and this patient briefly took Juxtapid for a couple of weeks before deciding to stop due to nausea and diarrhea.

The United States Attorney's Office for the District of Massachusetts ("USAO") began investigating Aegerion. Dr. Montaña became aware that his conduct was also being investigated in 2017. Dr. Montaña has fully cooperated in that investigation and has provided the USAO with critical information about Aegerion, the Aegerion executive he met with and the Aegerion sales representative. As a result of the USAO's investigation, Dr. Montaña pled guilty to a single count misdemeanor HIPAA violation on February 28, 2018. He has an ongoing cooperation agreement with the USAO, has testified before the grand jury, and will continue to assist in their investigation and the potential prosecution of the Aegerion executives. The government is not recommending any jail time as part of Dr. Montaña's sentence. In short, he recognized his mistake, has taken responsibility for his actions and is working to rectify that mistake.

Dr. Montaña is a compassionate doctor who cares deeply for his patients and tries to provide the best care possible with his limited resources. He was presented with the hope of a new treatment for his pediatric patients who had not responded to conventional treatments. While there are no allegations that Dr. Montaña's actions negatively affected patient care, in retrospect, Dr. Montaña realizes that in his overzealousness to find a new treatment for these patients, he improperly shared patient information with Aegerion. Dr. Montaña is remorseful for his actions and is committed to maintaining a HIPAA compliant practice in the future. To that end, Dr. Montaña's practice, Children's Cardiovascular Medicine, has engaged PCIHIPAA, a HIPAA consulting company which manages a portfolio of hundreds of health care practices nationwide, to conduct a HIPAA risk assessment and analysis, HIPAA compliance training and monitoring for his practice. These services provided by PCIHIPAA will begin immediately.

March 7, 2018
Page 4

This incident has deeply affected Dr. Montaña, his wife and their four children as well as his practice.  Although a small subset of patients' clinical data was accessed in hopes of trying to provide a cutting edge drug to treat his patients, there have been many sleepless nights as Dr. Montaña has repeatedly thought about the choices he now regrets. Moving forward, he has taken responsibility and several proactive steps to correct the matter.  First, he is reaching out to affected patients in his practice through notice letters in English and Spanish; to date, his practice is not aware that any patient's information was misused or further disclosed.  Second, he is reaching out to other health care providers and explaining the situation and his role. Third, the practice's HIPAA procedures are in the process of being reviewed and improved. Fourth, while he still maintains an office practice for pediatric cardiology, Dr. Montaña has also traveled to Boston to cooperate with the government in their investigation of Aegerion. Fifth, Dr. Montaña continues to improve his understanding and knowledge of HIPAA; he will be completing two separate HIPAA seminars through the Health Care Compliance Association: The Elements of an Effective HIPAA Privacy Program (March 2018); and HIPAA & The Medical Practice: Requirements for Privacy, Security and Breach Notification (April 2018).

Dr. Montaña sincerely regrets his actions.  At the time, he did not intend, in any way, to violate any law or do anything inappropriate.  He is committed to protecting patient information, and his practice will work hard to carefully maintain the privacy of such information.  He assures the Georgia Department of Community Health that this will not ever happen again.

Sincerely,

Dawnmarie Matlock

Dawnmarie R. Matlock

cc:  Eduardo Montaña, Jr., M.D.

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9

# Exhibit 15

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*



Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9

# Exhibit 16

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9



Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9

# Exhibit 17

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*



Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9

# Exhibit 18

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*



Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9



Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9

# Exhibit 19

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*



colombianitos
FUNDACIÓN COLOMBIANITOS
www.colombianitos.org

# ¡JOIN US TO ENJOY AN AFTERNOON FOR OUR COLOMBIANITOS!

An afternoon full of prizes, entertainment, music, food and many more surprises!

 

SATURDAY
nov 23   12:00pm – 6:00pm   Atlanta International School, AIS
2980 North Fulton Drive
Atlanta, Georgia 30305, USA

## PRICE: $ 60 USD

*One ticket includes: one (1) bingo board.



Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9



Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9

# Exhibit 20

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

| | |
|---|---|
| **From:** | Eduardo Montana <emontana@childrenscvm.com> |
| **Sent:** | Friday, November 15, 2019 1:56 PM |
| **To:** | Carolyn Regan |
| **Subject:** | Fwd: Annual Physical Day |

Sent from my iPhone

Begin forwarded message:

> **From:** "Jones, Heloise" <Heloise.Jones@pinnacle-ortho.com>
> **Date:** February 12, 2019 at 2:47:06 PM EST
> **Subject: RE:  Annual Physical Day**

Dr. Montana,

If I may be so particular and ask what is your criteria on energy drinks, do you have a criteria on how many they drink or is it just if they drink any at all?

Heloise

**From:** Eduardo Montana <emontana@childrenscvm.com>
**Sent:** Tuesday, February 12, 2019 12:43 PM
**To:** Jones, Heloise <Heloise.Jones@pinnacle-ortho.com>
**Subject:** Re: Annual Physical Day

Heloise

I can handle it if it is well coordinated, that is all vitals and questions answered and those needing screening sent to the cardiology space for me to decide if they need echo.

Criteria
1) Freshman first time or upper class men /women with new onset chest pain , dyspnea, dizziness or syncope (with or without sports) ,
2) irregular heart rate on exam or perceived by athlete
3) family history of either parent with MI, CVA or premature death
4) Athlete who has been told they have CHD or have been operated on for CHD
5) those taking supplements or drinking energy drinks

There needs to be another mid level or physician screening for these things and then highlighting the form and sending them to cardiology. If we have minimum 3 echo and techs, I can see them and decide who needs echo.

Give me the date again please. Also I will send you my cardiac risk evaluation form

Dr Ed Montaña

1

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

Sent from my iPhone

On Feb 12, 2019, at 9:34 AM, Jones, Heloise <Heloise.Jones@pinnacle-ortho.com> wrote:

> Dr. Montana,
>
> Good morning, I hope this finds you well.  I wanted to thank you for giving me Dr. Greffard's contact information, and I have reached out.  Unfortunately he will be out of town for that weekend and will not be able to help.  I am trying to find other physicians but am having no luck.  With that being said, I have a few questions for you:
>
> 1) What are your hard guidelines in screening individuals as in the past, if they are an incoming freshman we screen or if they have had previous screen and they have developed an issue within the last screening.
> 2) If they have a new or recent documented family history of heart condition.
> 3) Irregular heartbeat upon examination
> 4) Any other recommended screening guidelines?
> 5) Are you okay if you are the only cardiologist for the day if we can screen properly to eliminate any unnecessary screenings?
>
> Please let me know your thoughts so we can plan accordingly as I want to make sure that we have adequate help so that you do not become inundated with athletes and we get bogged down in that area.
>
> Heloise Belarmino Jones, MAE, ATC/L
> Director of Sports Medicine
> Pinnacle Orthopaedics
> 300 Tower Rd.
> Suite 101
> Marietta, GA 30062
> 770-427-5717 ext. 4024

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9

# Exhibit 21

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

| | |
|---|---|
| **From:** | Eduardo Montana <emontana@childrenscvm.com> |
| **Sent:** | Friday, November 15, 2019 1:56 PM |
| **To:** | Carolyn Regan |
| **Subject:** | Fwd: *External E-mail*  Re: 2019 Annual High School Physical Day |

Sent from my iPhone

Begin forwarded message:

> **From:** "Jones, Heloise" <Heloise.Jones@pinnacle-ortho.com>
> **Date:** April 16, 2019 at 7:42:52 AM EDT
> **Subject: RE:  *External E-mail*  Re: 2019 Annual High School Physical Day**

> Dr. Montana,

> Good morning!  I hope you are doing well.  There will be 6 physicians with maybe 2-3 mid-levels along with 3-4 RN's but currently you are the only cardiologist.  I have tried to get help from physicians but have not been successful.  We will do everything we can to make it as smooth and easy for you.  We will have mid-levels and RN's screening paperwork to make sure ONLY the one's who meet your criteria are screened so hopefully that will curtail any unnecessary delays.  See you on Saturday!

> Heloise

> **From:** Eduardo Montana <emontana@childrenscvm.com>
> **Sent:** Monday, April 15, 2019 3:30 PM
> **To:** Jones, Heloise <Heloise.Jones@pinnacle-ortho.com>
> **Subject:** *External E-mail* Re: 2019 Annual High School Physical Day

> Thanks Heloise how many physicians/mid levels this Year? Am I still the only cardiologist?

> I am looking forward to it!

> Dr M

> Sent from my iPhone

> On Apr 15, 2019, at 3:24 PM, Jones, Heloise <Heloise.Jones@pinnacle-ortho.com> wrote:

>> Dear All,

>> First I would like to thank each of you for making this coming weekend possible.  Without your help we would not be able to hold our annual physical day like we do.  Attached you will find the map of the campus and the highlighted areas are the most important as it directs you to parking and the building you will report to.

1

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

ALL volunteers will report to the second floor of the arena once you arrive to the Hospitality area.  Please arrive by 7:00 AM so that you have time to eat, assignments can be given, t-shirts distributed and questions answered so that we will be ready to go promptly at 8:00 AM.  *Physicians please arrive by 8:15 AM and go to the 2nd floor Hospitality area and someone will take you to your respective room assignments.*

Thank you all again and I look forward to seeing everyone there.  Below is my cell phone number should you need to reach me the morning of.  See you Saturday!

Heloise
404-394-3806

<NCHS Map.pdf>

This email originated outside the organization. Do not click any links or attachments unless you are positive about the identity of the sender. In case of any questions, please forward this e-mail to the IT department for review.

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

# Exhibit 22

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

## _Deaths propel heart tests for N. Fulton student-athletes_

The Atlanta Journal-Constitution

May 18, 2003 Sunday, Home Edition

Copyright 2003 The Atlanta Journal-Constitution

The Atlanta Journal-Constitution
ajc.com

**Section:** Metro News;

**Length:** 644 words

**Byline:** CHRIS REINOLDS

## Body

Athletes at a north Fulton County high school where a football player recently died were tested for enlarged hearts Saturday as part of a campaign that organizers hope spreads across Georgia.

Heart problems are the leading suspects in four recent deaths of young athletes in metro Atlanta. Doctors say it's usually one of two defects --- HCM, or hypertrophic cardiomyopathy (an enlarged heart) or abnormal coronary arteries.

The heart screening is the brainchild of Tom Vardase, producer of Georgia Public Television's "Prep Sports Plus." Vardase, who had a heart attack in 1999, said he wanted to do something when he saw healthy athletes dying.
AJC

"It's preventable, and it breaks my heart," said Vardase, who has formed a nonprofit sports foundation.

Heart Screens for Teens, a metro Atlanta partnership between Georgia Pediatric Cardiology, Ultrascan Inc. and Vardase's charity, will provide the service at cost for $58. Normally the screens can cost between $800 and $1,500.

The first heart screening event was held Saturday at Alpharetta's Chattahoochee High School, where 17-year-old Ryan Boslet died during practice Feb. 20.

Ryan's dad, Chris Boslet, said he didn't realize his son suffered from HCM.

"He had physicals all the time," said Boslet, who also has a 15-year-old son in football. "Having it so kind of out of the blue has been very difficult to understand. We feel so good about what is happening with heart screening. We're looking at this and saying maybe good can come from this.

"It's a pretty small price to pay for piece of mind."

The Boslets have helped set up a memorial fund through Bank of America called the "Ryan Boslet Heart Screens for Teens." As news of the screening spreads, Boslet said he hopes the fund will help pay for athlete testing in poor areas.

Screens have flaws

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9

Deaths propel heart tests for N. Fulton student-athletes

The ultrasound image of the heart is very specific for ruling out the condition, said Eduardo Montana, the doctor who is overseeing the Heart Screens program. The condition can also sometimes be identified through family history or previous symptoms. However, Montana noted some children with an enlarged heart don't have any risk factors.

Sudden cardiac death "is only rare until it happens to your child," Montana said. "This doesn't replace comprehensive screening, but we feel this is better than nothing. If we can diagnose one kid with HCM, it's worth doing."

Some doctors are against mass screening.

"I don't think that's the way to go. You cannot write them a note saying you're 100 percent something is not going to happen," said Dr. Robert Campbell, medical director of the Sibley Heart Center at Children's Healthcare of Atlanta.

He added that if echocardiogram screens would solve the sudden death problem, it would be mandated statewide.

The screen can give false positives and negatives as well as miss other serious problems, he cautioned.

"I'd hate for families to think there is a magic bullet," he said.

Campbell said a pre-participation form is helpful. The Georgia High School Association is working on a standardized form for athletes that includes key questions about family members younger than 50 who may have died of unexplained cardiac arrest.

Another tool

Cliff Lorick's two sons took the heart screen on Saturday with no problems detected. Jeffrey Lorick, 15, and Clifton Lorick, 16, both play varsity football and other sports.

"My sophomore was three feet from Ryan. It shook him up a lot," Cliff Lorick said.

While neither boy has a family history of heart problems, Lorick said the screens are another information tool.

"We don't think you can ever eliminate the risk from any contact sport," Lorick said. "I've always thought the physicals they took before playing were of marginal benefit. So I'm pleased to see something more technologically advanced."

## Graphic

Photo: Near her late grandson Ryan Boslet's picture, Carol Boslet signs up Kelsey Lowdy for heart screening Saturday. / JOHN AMIS / Special; Photo: Scott Cameron performs an ultrasound of Chattahoochee High freshman Matt Tieslau's heart Saturday. / JOHN AMIS / Special

**Load-Date:** May 18, 2003

End of Document

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*



## Cumming, GA

| Local News | Real Estate | Events | Classifieds |

# Heart Screens for Teens at Pinecrest Academy

Affordable tests for teens helps detect potential problems early.

By Michelle Helms | May 4, 2011 3:24 pm ET | Updated May 5, 2011 9:40 pm ET

Reply

*This post was contributed by a community member.*



Pinecrest Academy senior, Matthew Farkas, was diagnosed with heart disease at the age of 16. Hypertrophic Cardiomyopathy (HCM), is the leading cause of death in young athletes and can occur without warning, and quite often without any symptoms. Matt was the picture of good health at the time of his diagnosis and has been an athlete since second grade. Yet, he was diagnosed with heart disease during a routine physical, which proved to be critical in saving him from death on the football field or basketball court.

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

Ad closed by Goo

Report this ad

Why this ad? ▷

Not all athletes have been as fortunate as Matt in receiving an early detection. In reaction to the sudden heart-related death of Ryan Boslet, a 17-year-old Alpharetta athlete, Mickey King Jr., founder of Ultrascan, Inc., recruited top cardiologists and echo technologists to work with its mobile ultrasound units, screening students' hearts and detecting potentially fatal conditions.

Subscribe

Ultrascan, Inc. joined with Children's Cardiovascular Medicine of Marietta to offer "Heart Screens For Teens," an affordable screening program to schools, sports teams, and other organizations.

Cheryl Farkas, Matthew's mother, knows these dangers all too well.

Ad closed by Goo

Report this ad

Why this ad? ▷

"All young athletes should be screened for HCM and other heart defects," she said. Screening is recommended yearly for athletes 11-years-old and up, and in some instances,

required.

"Heart Screens For Teens is an awesome program that provides affordable screening for all. Typically, screenings are $900- $1,500, but we're fortunate to receive this service for just $65," said Farkas.

The echocardiogram exam is simple, safe, requires no preparation, and takes 10-15 minutes. A registered technologist uses an ultrasound unit, utilizing high frequency sound waves to create images of the heart and determine how well blood flows through the organ. Confidential results are analyzed by a board-certified pediatric cardiologist and given to parents. Any child found to have an abnormal test result is referred to the family's pediatrician for medical follow up.

The next Heart Screens For Teens event will be held on the Pinecrest Academy campus on Saturday, May 7, 8:30 a.m. - 3:30 p.m. The cost is just $65. Screenings will take place on the first floor of the Gannon Building. Contact Cheryl Farkas at  or 770-826-9478 for information on the Pinecrest screening event.

For more information on the Heart Screens For Teens program, call Ultrascan, Inc. at 770-813-8323 or (click here).



Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9

# Exhibit 23

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9

# City of Hope Project

## *EXECUTIVE SUMMARY*



## September 2019

[1]

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

# Executive Summary - City of Hope

## Goals/Objectives:

A collaborative partnership agreement of select like-minded community partners has been formed and led by the Georgia entity, CCM Global Health LLC a For- Profit entity, with the objective of providing safe haven environments to temporarily house, rehabilitate and provide critical social, legal and health services to marginalized populations in the U.S. which include under-resourced minorities, undocumented immigrants, and asylum-seeking refugees, many of which have because of their unwarranted circumstances have become victims within the drug, sex trade/human trafficking global conglomerate.

The partnership recognizes that these marginalized groups share many commonalties and are often indistinguishable to federal and state agencies resulting in poor coordination and management of their intake evaluations, placement and services afforded.

As stated, many of the younger members of these groups are forced to participate in sex-trade and threatened unjustly with criminal action, violence or deportation. Others are seeking refuge from oppression, war, and economic instability both in their home countries as well as in the US.

All are in desperate need of advocacy and humanitarian assistance as a matter of survival. Scarce resources nationally have made recidivism the norm, forcing many into a permanent life of illegal activity, drug abuse and human trafficking. The City of Hope aims to provide social impact solutions to break the cycle of oppression of these humans who deserve dignity and respect.

The Partnership also recognizes that the social, legal and health issues surrounding these marginalized groups are significant and complicated and that a multi-disciplinary approach is needed to address them. For this reason, we will join our resources to collectively bring together and leverage our vast public-private resources to address each individual in need in a specialized fashion.

Basic services that the City of Hope Project will offer include humanitarian, social, legal and health resources aimed at addressing their immediate social, legal and health crisis as we provide rehabilitative services to reintegrate them into society. These individuals and families are often burdened with serious legal/security issues and afflicted with acute health needs requiring urgent care. Many of the young adults and youth are victims of drug and human trafficking and need rescuing. Many of them have lost hope.

[2]

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9

The initiative, called The *City of Hope*, is to be a healing safe haven community for marginalized undocumented immigrant/refugee families and rescued victims of Human Trafficking providing an integrative rehabilitation and wellness approach including acute urgent care for critical essential health needs and intake assessment, case management with social and legal support, mental health assessment and treatment. The City of Hope will provide for short stay (< 30 day) evaluation and facilitate long term placement including housing, vocational education/job training and ministry.

## Project

The Project Partners have identified and recognized the State of Georgia, and the City of Atlanta's critical need to support the creation of "safe haven" sites for these marginalized victims of society.  The *Center for Immigration Studies* (https://cis.org/Map-Sanctuary-Cities-Counties-and-States) defines a "Sanctuary City" *"…cities, counties, and states have laws, ordinances, regulations, resolutions, policies, or other practices that obstruct immigration enforcement and shield criminals from ICE — either by refusing to or prohibiting agencies from complying with ICE detainers, imposing unreasonable conditions on detainer acceptance, denying ICE access to interview incarcerated aliens, or otherwise impeding communication or information exchanges between their personnel and federal immigration officers."*

*- Jessica Vaughan, CIS Director of Policy Studies*

Currently, Metropolitan Atlanta is facing serious deficiency of suitable organizations that provide legal services, specialized housing, social services and healthcare for undocumented immigrants released into society or wrongfully detained. Shelter to temporarily house immigrant families and rescued victims of human trafficking are needed now as fewer beds are available to serve the growing number of victims identified. Other facilities, such as detainee centers, churches, half way homes, and homeless family shelters and foster family homes, may not be able to adequately meet the needs of victims and provide them a secure safe haven rehabilitative environment.

Additionally, Atlanta Mayor Lance Bottoms has publically stated the recognized need of the Atlanta Board of Education, District 5, to bring collaborative efforts into these low resourced communities and populations in the city.  The *City of Hope* project aims to facilitate social revitalization of Metropolitan Atlanta's areas of scare resources, including, District 5 by bringing in a collaborative partnership of community leaders providing high quality social impact legal, health and education services as well as short term evaluation and housing facilities through our programs.

[3]

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

## City of Hope Philosophy

Immigrants, Refugee and HT victims represent a wide variety of distinct cultures, languages and traditions creating an essential need for advanced care and support:

Thus the City of Hope philosophy is to *"Serve with Love, Compassion, Respect and Human Dignity*. These constitute the foundational cornerstones of the City of Hope project that places the wellbeing of individuals constituting these vulnerable populations at the center of our mission statement.

## City of Hope Mission

Atlanta because of its reputation as a major international destination and being a gateway city to many other US metropolitan areas has the dubious distinction of having one of the largest and fastest growing immigrant/refugee populations and human trafficking victims. These men, women and children constitute the "silent minority" and are mostly uneducated, have poor health literacy, are low-resourced, and come from broken and impoverished families and from a variety of global urban and rural areas.

The City of Hope Project's mission is to unite collaborative of like-minded organizations that collectively can address the complex social, legal, mental and health issues that underlay the lives of these displaced people and their families. Lastly the project values social rehabilitation and prevention over one-time care, thus the project operational focus to *"Treat, Prevent, and Educate"* identified participants and engaging and empowering them to take control of their health and wellbeing above all else.

## Project Core Elements

*Identifying the at risk and marginalized groups* requires working directly with state and federal and private organizations that are first responders in contact undocumented immigrant and refugee families and who are required to place them in some active intervention facilities. Those young adults and youth identified as sex trade/HT victims require specialized assistance that only the trained and licensed professionals that City of Hope can offer.

However, we recognize that this is only the first step. These groups once they are removed from the hostile environments from which they were rescued, whether it be detention centers, domestic violence, substance abuse or the illegal sex trade are vulnerable humans, mostly young men, women and children that are from varied geographic and cultural backgrounds. Individuals in need of care come not only from

[4]

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

our state or southeastern regions, they represent many western and eastern European, Africa and Latin America and the Caribbean countries were poverty, insecurity and instability force them to flee.

Many of those countries are also strongholds for the mafias that control and benefit from global illegal drug, arms and sex trade.

The successful rehabilitation of these marginalized groups requires careful navigation through complex legal, social and medical environments that only professional trusted advocates and specialized organizations can provide. Some operational steps included are:

1. Working with the Federal Department of Homeland Security, Georgia Bureau of Investigation, Stage of Georgia Governor's Office and the City of Atlanta Mayor's office and the Atlanta School Board in to identify, rescue and treat marginalized groups.
2. Working broadly within the medical communities, the justice system and law enforcement to effectively, fairly, and efficiently reduce drug and sec trafficking in persons to the lowest level possible in the Atlanta Metro area and statewide.
3. Help ensure justice for the victims by making certain they are not treated as criminals.
4. Help ensure medical treatment, behavioral health plan, so they have access to health care after they are release from the program
5. Leverage community resources and increase coordination through multi-sectoral partnerships.
6. As part of the initiatives provides several training opportunities to community advocates

## City of Hope Scope of Services

**Solving Critical Social and Public Health Issues** – We strive to plan, design and implement a comprehensive program based on a "health village" concept to provide the four cornerstones of care offerings for marginalized victims of society identified:

1) Health Services
2) Temporary Shelter
3) Job Education/Training
4) Social/ Legal services.

[5]

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

# Collaborative Partners

## My Sisters Place:
### History

*My Sisters Place*'s Executive Director, Mia Pean- Pierre has worked tirelessly on the issues of child abuse, domestic abuse and sexual violence and Human Trafficking for decades making her a highly-respected, engaging speaker and an expert in child abuse prevention. She is widely recognized as an advocate for survivor empowerment throughout Florida and Atlanta, Georgia. Mia holds a Bachelor's degree in Sociology, and a Juris Doctorate from Nova Southeastern University.

At the age of 15, Mia survived a childhood full of hidden horrors. She has suffered through physical, mental, and emotional traumas caused by her stepmother. These traumas led to the silencing of her voice as she agonized with deeply buried emotional and physical pain. The abuse was immediately magnified by anger and vulnerability. She chose to use her experience as a channel to fight against injustice. She survived being homelessness and somehow found a way to turn her anger into a positive force for change.

The common thread she shares with many survivors of abuse motivated her to work with former victims of child abuse and with the aid of law enforcement and immigration authorities, she has fought the cause for victims in immigrant communities. Mia personally works with local officials in Haiti to enact new laws in the parliament for the justice and reparations for victims of human trafficking.

Many of these adults, adolescents and children are arrested and may be placed in family and juvenile detention facilities that are insufficiently prepared to provide them the much needed medical, social and protective services. The social crisis posed is just now being completely defined and must be addressed.

The stated *Mission* of My Sister's Place is "to actively pursue the protection of the human rights of women and girls by combatting human trafficking and modern-day slavery globally". This integrates well into the City of Hope expanded vison to bring aid to immigrant families.

Currently the stated goal of My Sister's Place is "to identify, rescue and restore those victimized and vulnerable to human trafficking by providing a safe environment, access to healthcare, technology and vocational education".

Thus the collaborative partnership formed between My Sister's Place, CCM Global Corporation and Aevolve Media to create safe haven communities addressing the critical needs of marginalized immigrant families and victims of Human Trafficking.

[6]

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

It is recognized however that the proposed project must be a collaboration between the many different state and local service systems throughout their recovery stemming from law enforcement and the court system to multiple social service agencies. These systems must work together to provide coordinated services to trafficking survivors.  They must also implement strong protocols to identify undocumented immigrant adults with criminal records and evaluate the families for Domestic Violence, Substance Abuse and other critical health needs.  In addition, youth of immigrant families must be recognized as potential victims of HT and to provide trauma-informed, empowering services to survivors and their families. My Sister's Place provides just such coordination of partners and ensures the victim's journey after their rescue is facilitated and successful.

## Aevolve Media Inc./Hope Fellowship Ministries

Aevolve Media Inc. and Hope Fellowship Ministires were founded by CEO/President Dr. Les Snead.   Pastor Snead founded 10 churches throughout the Southeastern United States and opened numerous Early Education centers, Job Training site and community clinics. Currently Dr. Snead leads his innovative digital media company providing social content using proporietary platform technologies spanning a continuum including Glboal Internet TV broadcasting for commercial and residential usage, Digital signage and messagin platoforms, Digital Editor capabilities and their laterst AMAXEdge smart phone application desinged to revolutionize information data management allowing users to manage all types of data (voice, video, medical grade, graphic and internet social media) from a smart phone platform.

Essentially, anyone with access to the AMAXEdge platform can edit a wide range of content and simultaneously push the same info to an unlimited number of digital media platforms including handheld smart phones and pads, system wide networks, or public e- billboards thus maximizing reach and content over possible globally seperated areas.

The implications and positive impact of being able to create instant public and social health campaigns became immediately apparent to Aevolve media.  Thus a partnership with CCM Global  Health Systems began combining CCM Global  propietary Preventive Medicine Program (PMP) software and integrating Aevolve (AMAXEdge) digital editing and messaging capabilites to enhance health and social education as a key component of the HT Project using the CCMcore philosphy to *"Educate, Treat, Prevent"* illness as a starteg to rehabilitate vulnerable populations.

City of Hope will implement for the first time the efficient and highly innovative "digital health ecosystem" powered by Aevolve Media as a core business and social strategical campaigns for the rescuing, rehabiliation of immigrant families and prevention of Human Trafficking.

[7]

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

## CCM Global Health LLC/ CCM Global Corporation 501©3

CCM Global Corporation (501©3) and CCM Global Health LLC and its subsidiary CCM Medical Service have over two decades of providing high quality, cost effective essential health services and sub -specialty care to families, adults, children, adolescents and young adults in the State of Georgia through our network of medical partnerships.

The CCM concept uses proprietary innovative modular container configurations as "hybrid clinics" that are highly efficient and mobile. CCM's modular design can also be used to construct an affordable, durable, and high quality housing facility of any size through its multiple container "mini" hotel design attached to a modular "health village" that is equipped to provide critical and essential health services to low resourced populations.

CCM Global Health is a proven healthcare model using efficient and lean processes based on the vison of the late Dr Roberto Kikawa founder of "CIES Brazil" a modular health infrastructure solution for critical public health needs which to date has provided care to over 2 MM individuals in São Paulo, Brazil and recently in Atlanta Georgia.

CCM Global Health is carrying on Dr. Kikawa's vision for innovative healthcare modular designs of adaptable and flexible "basic" and "advanced" mobile medical units (BMMU and AMMU) into configurations that meet the needs of specialized populations such as displaced immigrant families and victims of Human Trafficking, Refugee populations, victims of the Opioid Epidemic and Veterans. The BMMU and AMMU are transportable to rural areas and require minimal up front cost to implement and operate making them ideal for population initiatives over wide geographic areas.

Essential Health Services include the proprietary "gateway" Preventive Medicine Program" or PMP that provides a comprehensive and efficient Health Risk Appraisal (HRA) including anthropometric data, basic Lab analysis, vision, dental and hearing screening and concludes with a targeted medical consultation. In some cases, telehealth may be integrated into remote areas.

The PMP-S or specialty HRA may include needed tests such as STD screening, forensics, ob-gyn care, and diagnostic imaging. In most cases a BMMU (single refurbished container) model suffices. For the provision of "Second Line of Care" which may include more advanced diagnostic imaging, evaluation and treatment for Cancer detection and Chronic Disease management an AMMU configuration called "Health Village" is provided. This configuration of 3 containers, each with a specific evaluation and treatment modality to provide targeted specialty care (i.e. cardiovascular disease, Ob-Gyn services, minor surgical services, mental health) {see Appendix 1}

[8]

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9

**City of Hope Project Summary.**

CCM Global Health LLC has a decade long experience of providing healthcare solutions to vulnerable urban and rural populations globally establishing critical and essential health coverage where it is non -existent and summarily reduce the burden disease for men, women and children.

Additionally, the same design configurations addressing Basic and Preventive Services are highly adaptable and can provide, without significant added costs, emergency and urgent care, day surgery and diagnostic imaging and treatment for population health services at Level I and Level II in the care continuum.

The ultimate goal of a CCM Global Health designs is triage-based so that only the sickest and most acutely ill patients to be transferred and cared for at larger mostly urban Level III hospitals, thus effectively reducing their burden of care and freeing up scarce resources for the highest acuity patients and providing measurable cost savings.

CCM Global Health LLC recognizes that healthcare is a multi-disciplinary effort, thus we have collectively assembled a group of authoritative academic, government, and private partners to complement our service offering in a multi-disciplinary approach including legal advocacy, Health Sciences Education and training, digital technology and social, occupational and environmental health to offer a comprehensive "sustainable community" model guaranteeing a healthy and safe future for marginalized populations giving them economic stability and opportunities in the workforce for decades.

This metric of success not only is derived from building an infrastructure of well designed, functional and economical array of mobile units providing critical legal and health services using unique technology (Digital Health Ecosystem-DHE), but in the culture of changing attitudes regarding the dignity and respect that marginalized populations deserve.

Certainly any effort at social transformation should be made atop a foundation of superior coordination of care, data sharing, professional decision making and standardization of the evidenced based medicine protocols to improving outcomes.

Respectfully,

*Eduardo Montaña, M.D., M.P.H., M.B.A.*

*CEO/President*

*CCM Global Health LLC USA*

[9]

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

*Tele: +404-213-6060*

*E Mail:* Eduardo.Montana@childrenscvm.com

*"Your Health, Your Family's Health, in Your Hands"*

## APPENDIX I.
## City of Hope Infrastructure Development

I.   **Temporary Residence Housing**: Multi Unit Container configuration in a "mini" hotel structure that can provide residence from 10-50 people, easily expandable, customizable all basic amenities at a fraction of the cost.  Manufacturer: "Gulfstream Containers" Doral Florida, owner/operator Mr. Angel Dones (CCM manufacturing partner), provided near cost.

II.  **Operational Structures: "Health Village" concept (CCM Global Health) with additional administrative, service office space, made custom design to fit City of Hope needs.**

III. **CCM Global Health LLC** will provide centralized healthcare delivery services to meet the critical essential and immediate needs of our detained immigrants, refugees or rescued HT victims starting with the Basic Health Assessment and the Preventive Medicine Program "PMP".   The aim of this gateway assessment is to conduct a comprehensive Health Risk Appraisal (HRA) for each patient that will allow adequate case management of their health and social needs.

Configuration:  FIVE (5) BMMU's or basic medical mobile units will be deployed in strategic District 5 areas (to be identified by strategic planning committee) to facilitate the demand for 24-7 medical care in the high risk areas for the rescued victims. Each BMMU can serve 10,000 patients per year and it is recommended that FIVE (5) BMMU's are needed for covering the defined Metropolitan area chosen.

ONE (1) AMMU or advanced medical mobile unit configuration design clinic to be deployed on site as a cornerstone administrative element of the City of Hope
Services. (see Appendix II & III: Configurations)

IV.  **Health Education/Messaging Technology -** The City of Hope will be integrated with proprietary messaging and communication technology

[10]

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

designed by Aevolve partnership.  This innovative technology provides a network platform to disseminate vital and empowering health information content that enhances and supports the evaluation and treatment of our patients.

This offering includes proprietary foundational software City of Hope Project that facilitates data confidentiality, shared service delivery across a secure professional network, integrated messaging and video educational platforms for operational efficiencies and quality.

The platform is equipped with a highly functional smart phone app (powered by Aevolve Media Inc.) allowing collaborative partners to provide services and share data in a highly confidential and efficient way.  Ultimately, the Aevolve technology provides for necessary quality metrics and reporting for strategic planning, capital campaigns and marketing.

[11]

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

## APPENDIX II: CITY OF HOPE

## INFRASTRUCTURE DESIGN

### "Health Village Design"



360° Arena + Truck

[12]

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*



360° Arena + Truck

**Appendix III;** *Specialty Administrative Units City of Hope*



[13]

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9







[14]

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

# Exhibit 24

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*



**BOARD OF DIRECTORS**

**Judith Flores, MD, FAAP, CHQM**
*Chairwoman*
Dept. of Ambulatory Care
Coney Island Hospital
Brooklyn, NY

**Elena Rios, MD, MSPH, FACP**
*President & CEO*
National Hispanic Medical Association
Washington, DC

**Nereida Correa, MD, MPH**
*Chairwoman Elect*
Associate Clinical Professor of Obstetrics
Gynecology & Women's Health
Albert Einstein College of Medicine
CEO, Eastchester Medical Associates, PC
Bronx, NY

**Minerva Campos, MD, MPH**
*Secretary*
Washington, DC

**Gilbert Burgos, MD, MPH, CPE**
*Treasurer*
Chief Medical Director
Nassau Queens Provider Performing System (NQP)
East Meadows, NY

**Maria Carrasco, MD, MPH**
Regional Physician Lead on Cultural Competence
Kaiser Permanente
Montebello, CA

**Carlos Corral, MD, FACS**
El Paso Cardiac Vascular & Thoracic Surgeons P.A.
El Paso, TX

**Francisco Fernandez, MD**
Director, Population Health and Community
Engagement, Institute of Neurosciences
Professor of Psychiatry, University of Texas Rio Grande
Valley, School of Medicine
Edinburg, TX

**Maria M. Garcia, MD, MPH, FACP**
Professor of Medicine
University of Massachusetts Medical School
UMass Memorial Medical Center
Boston, MA

**Pilar Guerrero, MD, FACEP**
Assistant Professor
Rush Medical College
Chicago, IL

**Bert Johansson, MD, PhD**
Pediatric Critical Care
El Paso Children's Hospital
El Paso, TX

**Elizabeth Lee-Rey, MD, MPH**
Private Medical Practice, Partner
Eastchester Medical Associates, PC
Bronx, NY

**Flavia E. Mercado, MD**
Medical Director, Inovalon, Inc.
Snellville, GA

**Diana Ramos, MD, MPH, FACOG**
Assistant Clinical Professor
Keck School of Medicine of USC
Los Angeles, CA

**Adalberto Renteria, MD**
Chief Medical Officer
Central California of Adventist Health
Fresno, CA

**Claudia H. Zamora, MPA**
Founder & CEO, Zamora Consulting Group
Washington, DC

**Maria Mora Pinzon, MD, MS**
Chairwoman, Council of Young Physicians
Madison, WI

**Juliana Jaramillo, MD**
Chairwoman, Council of Residents
Brooklyn, NY

**Julia Yijia Jaw Su**
President, Latino Medical Student Association
Hempstead, NY

**ADVISORY COUNCIL**

**Richard H. Carmona, MD, MPH, FACS**
17th U.S. Surgeon General (2002-2006)
Chief of Health Innovation, Canyon Ranch
Distinguished Professor,
Zuckerman College of Public Health,
University of Arizona, Tucson, AZ

**Henry Cisneros**
Chairman, CityView, San Antonio, TX

**Ronald Estrada**
Vice President, National Community Empowerment,
Univision, Washington, DC

**Linda Griego**
President & CEO, Griego Enterprises, Inc.
Los Angeles, CA

**Paloma Hernandez, MPH, MS**
President & CEO, Urban Health Plan, Inc.
Bronx, NY

**Yasmine Winkler, MBA**
Senior VP, Innovation and Productivity
United HealthCare, Chicago, IL

**Richard Zapanta, MD**
Orthopedic Surgeon, Monterey Park, CA

November 13th, 2019

To Whom It May Concern
Office of the Inspector General (OIG)
330 Independence Ave. SW
Washington, DC 20201

Dear Sir/Madam:

This letter is written on behalf of Dr. Eduardo Montaña Jr., M.D., M.P.H., M.B.A., a respected physician in the State of Georgia licensed since 1992 with a solid reputation of providing pediatric cardiology, family preventive medicine and preventive cardiology services for the State's youth for over 25 years. Dr. Montaña has also involved himself in many regional federal and international initiatives to provide improved access and higher quality medical care to populations that are under resourced.

I first met Dr. Montaña almost 8 years ago as he participated in the National Hispanic Medical Association (NHMA) Health Policy Fellowship in Washington DC and at the conclusion, we awarded him the NHMA Fellow of the Year award at our convention. Dr. Montaña has demonstrated a longstanding commitment to the health issues around major critical health issues of minority Hispanic families. He served for several years as a NHMA conference leader within CVD prevention presentations, and served for two years on the National Hispanic Health Foundation (NHHHF) Board on the federal level advocating for improved access and quality of care for minority youth and their families. During this time, he also served as our representative to the Georgia Hispanic Health Coalition (GHHC) for a 5-year term as GHHC Chair of the Board. Like NHMA/NHHF, the GHHC is a state organization with almost 30 years of history that was founded by Mercy Care St. Joseph's hospital in Atlanta, GA. GHHC gives this population a voice at the regional and national level as they participate in Health Policy discussions as the Southeast arm of the NHMA. Additionally, Dr. Montaña engaged the NHHF Board members in several ventures with telemedicine initiatives to benefit Hispanic physicians nationwide. He served the NHHF well and was an engaged participant during his tenure as Board member.

It is my opinion that Dr. Montaña works tirelessly serving his patients and local community. He is an active member of the Georgia Hispanic Chamber of Commerce and Dr. Montana's contribution to the minority communities in Georgia is unparalleled. Prohibiting him to federal health care programs would affect our minority community negatively. For these reasons, I respectfully ask that the OIG consider absolving Dr. Eduardo Montaña from any consideration to exclude him from any Federal Health Care programs including Medicaid, Medicare, VA Health, Tricare, and CHAMPUS, allowing him to continue his community service unabated.

Sincerely,

Elena Rios, MD, MSPH, FACP
President & CEO

CC: Mrs. Angie Burnett Esq.
Alston Bird Attorneys
One Atlantic Center
1201 W Peachtree St NE #4900,
Atlanta, GA 30309

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

# Exhibit 25

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

*TO WHOM IT MAY CONCERN*

*OFFICE OF THE INSPECTOR GENERAL (OIG)*

*330 INDEPENDENCE AVENUE, SW*

*WASHINGTON, DC 20201*

Dear Sirs/Madams

This letter is written on behalf of Dr. Eduardo Montaña Jr., M.D., M.P.H., M.B.A, a Pediatric Cardiology physician in the State of Georgia who recently evaluated and treated my 10-year old daughter, Elisabeth for a condition called Pediatric Autoimmune Neuropsychiatric Disorder Associated with Streptococcus (PANDAS).

Dr. Montaña and his staff demonstrated compassion and genuine interest in understanding the complex medical condition with which my daughter was diagnosed.  Not a commonly known or understood condition, PANDAS is often dismissed as non-real medical diagnosis despite much literature to the contrary.  Many physicians dismiss this diagnosis not paying it the attention it deserves, however Dr. Montaña showed a keen interest in learning more about this interesting and potentially devastating illness that is thought to be afflicting thousands of people annually.

Dr. Montaña listened intently as I told him the medical journey I had taken with my daughter Elisabeth to find out what was causing her unusual symptoms and making it difficult and near impossible to lead a normal life.  While he states clearly that he only practices pediatric cardiology, he would advocate for us to find the best evaluation methods and possible treatments for her condition.

The simple act of caring enough to listen separates the care given by Dr. Montaña and his staff. They have a reputation as a very caring and compassionate medical group that treats all patients regardless of ability to pay equally.

For these reasons, I respectfully request that the OIG not exclude Dr. Eduardo Montaña from any Federal Health Care programs including Medicaid, Medicare, VA Health, Tricare, and CHAMPUS.  We are fortunate to have commercial insurance, however patients with federal health insurance deserve the same quality care Dr. Montana provides.  He is a vital health care provider for the Medicaid population in Georgia, including but not limited to the area of pediatric cardiology, and such an exclusion would adversely affect the health care provided to underserved populations in Georgia, specifically Atlanta and the surrounding areas.

Sincerely,

**Carol Muro**

**235 Beacon Knoll Drive**

**Alpharetta Ga 30022**

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

# Exhibit 26

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

Noviembre 14 2019

A quien corresponda:

Tengo varios años trayendo a mis hijos Ramón, Laura y Adán los cuales tenían  Medicaid- Amerigroup para que fueran vistos por el Doctor Montana y para mí ha sido el mejor Doctor.

Como el Doctor es Pediatra Cardiólogo, el refirió a mi hijo Ramón un cardiólogo de adulto el cual no me gusto, entonces yo hable con el Dr. Montana para que lo volviera a ver y el con gusto me lo recibió nuevamente.

Él es muy amable y lo hace sentir a uno muy bien y tranquilo le he confiado   la salud de mis hijos por varios años y yo confió en el totalmente.

I have several years bringing my children Ramon, Laura and Adam who had Medicaid-Amerigroup to be seen by Dr. Montana and for me he has been the best doctor.

As the Doctor is A Pediatric Cardiologist, he referred to my son Ramon an adult cardiologist whom I did not like, so I spoke to Dr. Montana to see him again and he gladly received him again. He is very kind and makes one feel very well and calm I have entrusted the health of my children for several years and I trusted him totally.

Sixta Botello Zamarripa

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

# Exhibit 27

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9



Michael G Anderson
Stephanie H Anderson
Historic Hawkins House
391 East Main Street • Canton, GA 30114
HappyHealthy.com

November 22, 2019

Amy Flynn, Investigations Analyst
OIG/HHS/OI
15 New Sudbury Street, Room 2111
Boston, MA 02203

**Re:   Eduardo Montaña, M.D.: We need him to continue as a Medicaid enrolled pediatrician.**

Dear Ms. Flynn:

By way of introduction, I am a physician who has a pediatric practice called Children's Pediatric Center, which is located in Canton, Georgia. Notably, 25% of our population in Canton speaks Spanish, and 89% of Canton's non-citizens are from Latin America. Approximately 70% of the Canton population is on Medicaid. I have known Dr. Montaña, as my pediatric colleague, for more than fifteen years. **Our community needs him to continue as a Medicaid enrolled pediatrician.**

My independent pediatric practice in Canton is located about 20 miles from Jasper, Georgia, a small rural town in Northeast Georgia where Dr. Montaña visits twice a month to see patients. In 2015, my practice was certified by the National Committee for Quality Assurance as a NCQA Patient-Centered Medical Home. Dr. Montaña is the best pediatric cardiologist I know, and he provides a much needed specialty involving fragile newborns, children and teens.

Dr. Montaña is the only cardiologist I know who will eagerly serve Medicaid patients, and then the only one eager to serve patients from the Spanish speaking community. Of course, Dr. Montaña is a native Spanish speaker who works with me to serve this community as his personal mission.

**We need Dr. Montaña, and please know that I believe that my ability to care for this community of patients would be seriously harmed if Dr. Montaña is not able to participate in Medicaid.** I have referred patients to Dr. Montaña for many (more than fifteen) years, especially when he travels to Jasper. A large percent of the children are Spanish speakers from Mexico or Latin America. He always agrees to see all the patients I send his way regardless of the payment source, if any, and whether I need to send patients to him in Jasper or at his office location in Marietta. I have personally heard from many patient families who appreciate the compassionate care he has given them. They are relieved that he accepts Medicaid and is able to discuss their health care issues and their children's care in Spanish or Portuguese.

*cont. page 1 of 2: Letter of Support for Eduardo Montaña, M.D.*

APPROVED *Michael G. Anderson* MD FAAP
By Michael G. Anderson at 9:49 am, Nov 22, 2019

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9

*cont. page 2 of 2: Letter of Support for Eduardo Montaña, M.D.*

It is absolutely crucial for parents to understand their child's heart condition, medications, symptoms to watch out for, and what to do in an emergency. I have seen firsthand the direct, positive effect that Dr. Montaña has on improving access and quality in pediatric patient care in Georgia, especially for those families on Medicaid and who do not speak English. He is an outstanding physician in every way – he shares his mobile number and comes day or night to help children with heart conditions.

Please help me with the challenge of securing pediatric cardiology care for the Medicaid, Spanish speaking children in our community. I implore you, please, not to exclude Dr. Montaña from treating Medicaid. I know him to be a kind and personally responsible person. I cannot bear to imagine the difficulty of securing pediatric cardiology care for Medicaid Spanish speaking patients without Dr. Montaña. Please don't remove Dr. Montaña from Medicaid because that would adversely affect Medicaid patients' ability to receive quality pediatric cardiology care, especially in Jasper and the surrounding rural areas. Exclusion would also destroy Dr. Montaña's overall practice, which is mostly Medicaid patients, including at his main location in Marietta, which is one of Atlanta's largest suburbs.

64% of Medicaid beneficiaries in Georgia are children, and Dr. Montaña has helped to change Medicaid patients' lives for the better. Please let him continue to do so. I need his help to continue providing quality care to children in our communities, especially Spanish speaking minorities.

In my opinion, there are very few of us who are enthusiastically accepting and caring for patients on the Medicaid program, especially those who speak Spanish – Dr. Montaña is one of those few physicians. His pediatric cardiology specialty is greatly needed in rural and urban areas of Georgia, and he treats Medicaid recipients with honor and respect. He provides critical skills in an under-served area – we need him to remain a Medicaid provider.

If you would like to hear further why I believe Dr. Montaña is such a critically important pediatric provider in our community, please call me at 770.720.6963. Thank you.

Sincerely,

*Michael G. Anderson MD FAAP*
APPROVED
*By Michael G. Anderson at 9:49 am, Nov 22, 2019*

Michael G. Anderson, M.D., J.D., ESQ
Attending Pediatrician and Gen. Counsel

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

# Exhibit 28

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9

Dec. 27, 2018

The Honorable M. Page Kelley,

My name is Eduardo Montana III and I am the second of four children to my father, Eduardo Montana Jr. For the 21 years that I have been in this family, I have watched as our dad took every opportunity he could to teach us what it means to be a good person, and all the complexities that come with that.  He would tell us stories of his father, my grandfather and childhood idol, illustrating how he was respected among his colleagues and adored by his family for simply treating people with respect and dignity. My grandfather, Eduardo Montana Sr., was a legend in the family and his many words of wisdom are passed down like folklore. I know that my father looked up to him like no other and strives to model his own integrity and good-faith after his father.

Growing up with the same name as these two men, it always felt like there was an expectation that I had to uphold to truly deserve the name Eduardo Montana. I cannot count the amount of times in my adolescence when I was at a function or formal party and people would go off on neverending tangents after hearing my last name and relating it to either my grandfather or father, both Dr. Montana. I would hear things about how honorable my father is, and his willingness to go out of his way to help people. People would talk about how my father was an ambitious and dedicated professional, but also a kind and sensitive man with a work ethic that is unrivaled. Hearing these incredible things about my father from people that apparently knew me when I was a baby was eye opening, because the best judges of a man's character are the people on the outside with differing experiences that help paint the clearest picture. I am proud to say that the image that was painted of my father by his friends and colleagues is a largely truthful one.

In short, my father has been one of the best role models for me in my life. Time and time again he has set an example on how to be a good father, a righteous man of faith, and how to conduct oneself in the world. During the hard times, he guides our family with a steady hand through whatever challenges we're facing and provides sound emotional council to us and anyone who needs it, when they need it. That's just the kind of person he is. Four summers ago, for example, I was working at my dad's medical practice as an administrative assistant, and one of my friends was shadowing my father as an intern while he took care of patients and interacted with their families. After a week of shadowing my dad, my friend came up to me after class raving about him. She was genuinely enthralled by his character and the empathy he showed to all of his patients. She told me that in the exam with him, a typically drab and anxious doctors office environment was transformed into a comforting and warm, yet thoroughly professional exam room where he treats patients like his own family. The families of the kids he was treating, many of which don't speak English and often have difficult experiences in most English-speaking clinics in our country, felt valued and reassured that my father, Dr. Montana, was taking care of their children and able to explain each diagnosis in a way that all parties

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

could understand and be on the same page. At the end of her stint shadowing my dad, he wrote her a letter of recommendation that helped land her an internship at Piedmont Atlanta Hospital. To this day she talks about how my father stimulated her interest in medicine and public health in a way that made her seriously question how she could enact real change in the field.

Dad's kindness reaches well beyond my friend too. I recall when I was in middle school, and my father one day brought home a man that I was introduced to as Quincy. Quincy was homeless and in need of help when he and my father crossed paths. It was clear when he brought Quincy home that he didn't hesitate for a second in helping this man in need. For the next six months they were in regular correspondence as my dad worked with Quincy back on the right path. To my dad's great disappointment, Quincy eventually ended up leaving town without a trace or explanation, and my father couldn't help but feel partially to blame, almost as if he failed Quincy. This so clearly emphasizes the kind of person he is; a generous, selfless and empathetic man who wants to make everyone he meets a better version of themselves.

In sum, my dad is a good man who tries hard to teach my siblings and I how to live a life of happiness and common humanity. He is not perfect, far from it. But even when he's at his lowest, he takes responsibility for his actions and he uses his downfall to show us how to be better. Because of him and what he has taught me for 21 years, I feel confident in who I am and where I want to go. He has been the greatest role model I could've asked for, and I am proud of how our relationship has evolved. He has seen the error of his ways and is ready to make it up to his family. I don't doubt that he will.

All the best,

Sincerely,
Eduardo Montana III

December 27th, 2018
The Honorable M. Page Kelley
United States District Court
District of Massachusetts

The Honorable M. Page Kelley,

It is truly my honor to write this letter and share with you some insights into the character of my father, Eduardo Montana Jr.

To provide a bit of background, my father grew up in Rome, Georgia as the son of two Colombian immigrants. While he lived comfortably and enjoyed a fruitful childhood exploring the foothills of the Appalachian mountains, he always understood the sacrifices made by his parents to get them where they were and it instilled in him a work ethic that I continue to strive towards today. This work ethic manifests itself in surges of proactivity which drives my dad to constantly take on new projects, whether he's in Ecuador helping to establish hospitals, or in Brazil working with CIES to deliver mobile healthcare to rural populations. While my dad is a practicing physician, he has never limited his scope to simply medicine, and his charisma and motivation have allowed him to spread his talents and experiences to far corners of the world. Throughout our childhood, my siblings and I were always hearing exciting stories about his times in India and in the Amazon with the CDC, and I didn't realize it then, but my father was already painting me a picture of the vast landscape of opportunity that is our Earth, and this played a crucial role in my development as not only a child but as an academic.

In my 20 years of knowing Eduardo Montana, I can confidently say he is the most reliable person in my life. I write this letter today knowing that if it were him writing one for me, he'd write the best letter he possibly could. When problems arise, whether they be financial, academic, or personal, my father is always able to provide a level-headed and wise take on the situation, which is a necessary complement to my over-complicating way of thinking. He thrives in stressful situations, like the time he single-handedly packed up an entire campsite as a lightning-storm rained down on my siblings and I at 5 am at the top of a mountain. His reliability extends to even when we're not with him, for I know that whenever I call him, regardless of what country I'm in, he will pick up the phone and leave me only with solutions.

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

December 27th, 2018

The Honorable M. Page Kelley

United States District Court

District of Massachusetts

I hope that you now have a better understanding of my father's character, and that you see what an influential force he is to him family and friends. I wish him great support and love in the coming weeks, and that his genuine, strong traits will shine brightly as they always have.

Yours sincerely,


Fernando Montana

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

P a g e | **1**

Nancy J. Anthony
10760 Branham Fields Road
Johns Creek, GA  30097

Honorable M. Page Kelley
United States District Court
District of Massachusetts
1 Courthouse Way
Boston, MA 02210

Your Honor,

My daughter, Mara, became a patient of Dr. Montaña's just hours after her birth on March 21, 2002.
She is my sixth child and it was apparent that something was terribly wrong shortly after her coming into
this world.  Her oxygen levels were dangerously low, and she turned blue.  The nurses rushed Mara
rushed out of my hospital room for emergency assistance.  A few hours later, Dr. Montaña arrived at my
hospital room and with a tremendous amount of compassion, informed us that Mara has a rare
congenital heart defect called Ebstein's Anomaly.  Her case of Ebstein's Anomaly was not only severe,
but life-threating.  Upon hearing the shocking news, I remember feeling frightened, worried, and
overwhelmed.  Mara's condition was critical, and I had to place my daughter's life in the capable hands
of Dr. Montaña.  Dr. Montaña spoke at length to inform us about Mara's condition and the medical
procedures undertaken for her care.  We were confident that Mara was in the best of hands and that
everything medically conceivable was being done to save her life.

Mara spent a total of three weeks in the NICU. The first three days of Mara's care were the most critical,
as she was fighting for her life.  Over the course of Mara's three weeks in the NICU, Dr Montaña visited
each day to check on Mara's progress.  He worked closely with the NICU staff, consulted other
cardiologists in and outside the Atlanta area, and gave our family daily updates.  Dr Montaña also
encouraged us to call him on his personal cell phone if we had any questions or concerns.  Through
Dr. Montaña's supervision and care, Mara was able to leave NICU and returned home to her loving
family.

Our daughter is now sixteen years old and Dr. Montaña has closely monitored Mara's condition.  He
examines Mara at least twice a year and has consistently researched and sought the best treatment for
her condition.  Dr. Montaña always gave us hope that medical procedures would one day improve so
that a more permanent health solution could be found.  By the summer of 2017, Mara's heart condition
worsened.  Dr. Montaña ordered several medical tests for Mara and consulted with other cardiac
specialists across the country.  Based on his initiative, a council of surgeons collectively decided that
Mara needed open heart surgery.  Dr Montaña referred us to Boston Children's Hospital where the top
surgeon specializing in Ebstein's Anomaly practices.  Initially, Mara was frightened about the open-heart
surgery; however, Dr. Montaña met with Mara regarding all her concerns.  He took time to answer
Mara's countless questions while treating her as an adult.  Mara concluded that she could trust Dr
Montaña saying, "I have known Dr. Montaña my entire life and in all that time he has always been

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

Case 1:18-cr-10044-MPK   Document 34-1   Filed 06/22/22   Page 146 of 175
Case 1:18-cr-10044-MPK   Document 26-3   Filed 01/07/19   Page 3 of 3

P a g e  | 2

upfront and honest about my condition".  Ultimately, Mara trusted Dr. Montana opinion, knowing that her surgery was necessary, and that Boston had the best surgeon for her condition.


This June, Mara underwent open heart surgery at Boston Children's Hospital and the results were better than expected.  Our daughter now has a pacemaker, a "rebuilt" heart, and can now live a normal life. Just one month after surgery, Mara participated with the high school marching band as a color guard. Six months after surgery, she is off all medications, has no physical restrictions, and feels better than she has ever felt.  We are most grateful to Dr. Montaña for his perseverance in locating the best doctors, the most up-to-date medical procedures, and best treatment for our daughter.


We understand that Dr. Montaña is facing legal issues; however, our experiences with him are far different as we see him as a dedicated, hard-working, and patient-centered physician that wants the best for children under his care.  We certainly hope that Dr. Montaña can continue to practice medicine and continue to provide our daughter the best of medical care.

Kind regards,



Nancy J. Anthony

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9

The Honorable M. Page Kelley
United States District Court
United States of America

Dear Judge Kelley,

I am writing this letter in support of my brother Eduardo Montaña.
We were raised in a loving home by a very compassionate, kind & wise man that instilled in
each of us a sense of morality & integrity. Our father was a highly respected pediatrician &
member of the community. He believed in humanitarian causes & was a diligent public servant. I
know my brother, Eduardo wished to continue our father's
Legacy.
Ed devoted many years of his life studying to become a pediatric cardiologist to be able to care
for children as our father did.
In his personal life, Ed is a devoted father & husband. He spends quality time camping &
traveling with his children.
My hope is that this letter gives you an insight as to the values my brother Eduardo was raised
with & strives to emulate each day.

Sincerely,
Maria Montaña

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

M. Benjamin McGuffey
1030 Mabry Oaks Drive
Brookhaven GA 30319

December 29, 2018

The Honorable M. Page Kelley,

It is both an honor and a privilege to provide a character reference for Dr. Eduardo Montana Jr.

I have known Ed since 1975 when his family moved into our neighborhood when we were both around 12 years old. That was the beginning of what has been a 43 year friendship. We grew up together and attended the same middle and high schools and, even though we attended different colleges, we have always remained close and I have counted on Ed's friendship and wise counsel.

Ed is foremost a deeply caring and hardworking father who always puts his wife Juliana and family first in both thoughts and actions. He is a great father to Amina, Eduardo, Fernando and David, and I was honored when he asked me to be the godfather to his eldest son Eduardo. Through the years, I have witnessed Ed making good choices as he raised his children – three of which are now on successful college tracks. He was a role model to me as my first son was born several years after Ed became a father. Together we have shared many family moments together – camping, hiking, birthday parties – and we have shared as many laughs as we have tears together.

When his father, Eduardo Sr., passed away unexpectedly in 2004, Ed stepped up to assume the role of patriarch of the Montana family. He made sure his mother who is in early stages of dementia was taken care of and he continues to care for her. His family commitments go beyond is own immediate family, as he has also provided a home for his wife Julianna's parents who now live together in their home.

I have watched Ed over the years become a successful pediatric cardiologist and create a thriving independent practice in an era that has seen much consolidation of doctors into larger businesses. From everything I know about Ed, he has always put his patients first and was willing to put in the long hours and weekends on call to be available when people needed his expertise.

Over the years, I have valued Ed's friendship, his opinions and wise counsel as we discussed life, careers and family. Even with his success as a doctor, he has always remained grounded and available to those around him. I have been blessed to have Ed in my life. He is someone I can trust to tell me when things are going right or wrong, someone who never gives up on a friend, someone who provides honest feedback and is accountable someone who is willing to share his faith in God, someone who brings energy and enthusiasm and, someone who I know I can count on as I have for these last 43 years of our friendship.

Yours Sincerely,

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9

Ben McGuffey
1030 Mabry Oaks Drive
Brookhaven GA, 30319

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

December 30, 2018

**Judge M. Page Kelley**
**United States District Court**
**District of Massachusetts**
**Attn: Kellyann Moore**

Dear Honorable Judge Kelley,

I am writing this letter of support from my husband, Eduardo Montaña whom I have known for 13 years and been married to for eleven years.  He is a man I know better than anyone else as we have together celebrated his successes and weathered his failures as a couple.  While the events of the last few years have been especially difficult and trying for our family, I steadfastly stand by Eduardo, his integrity, his values and his work ethic.

The man I love, married and chose as the father of our seven year old son David, is an outstanding human being with a sound character who readily helps others and routinely put his needs last.  Likewise as a partner and father he is exceptional, an excellent role model for our son and his three older children whom we co-parented with his ex-wife.

Eduardo is a man of God who places his faith first and has readily dedicated his life to the service of his patients and community.  As he was raised in a strong Colombian family tradition, his parents educated him to be a person of faith, high morals and values which resulted in his life purpose to serve others in need.  His father was also a pediatrician in a small Georgia community for almost 50 years until his death.

Eduardo studied hard reach his goal as a physician serving the needs of infants, children and adolescents with cardiac issues.  He has served in academic positons and large group practices however decided to dedicate his craft to his community having established his private medical practice almost twenty years ago in a northern suburb of Atlanta Georgia.

After years of practicing cardiology in his practice he got his MBA. That made him realized he could do more for the community. Since then he has been involved in global projects that required more and more of his time and effort.  He was involved in research and was always interested in broadening the impact of his professional life serving the community.

We have discussed and prayed over the events leading to his involvement in this case, and he has accepted full responsibility and the consequences of his actions. This has come at great emotional, professional and personal suffering for Eduardo.  He is remorseful and actively committing his life to improving and remedying his flaws that led to his poor judgement.  He has taken proactive steps in his medical practice to assure compliance so that this type of event will never recur.

It is through the strength of our marriage and steadfast support of our family and friends we have overcome this phase of our life.   As his wife and partner, I am certain that his actions were in no way financially motivated or entered into for any personal gain. His patient relationships are sacred and he would never intentionally place his patient's safety in danger.

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

I respect Eduardo for always trying his best to place his personal and professional relationships in the highest regard and for this reason, he is well liked and widely respected among the medical community and socially. He has taught me to believe in others and try to help other always. Perhaps he was this desire to always be  available for others was naïve and led to this situation professionally where he was taken advantage of by others.

As he was solely responsible for his actions though, he suffered the consequences and managed the impact on his family and medical career with integrity.   I have seen firsthand the personal toll this legal experience has taken on Eduardo.  He has been humiliated, denigrated and abandoned by peers. Unfortunate media coverage of the events led to close professional colleagues questioning his intentions and distancing from him.  Eduardo stood firm and chose to call personally colleagues and friends, standing before them and accepting the consequences.   By and large those who know Eduardo well told him his reputation as a caring physician needed no defense, and that his character was intact. This gave Eduardo the courage to go on with his life.

Eduardo's medical practice continues steadily, despite a drop in business.  Our family has suffered also worrying how this may impact our lives.  Our marriage, while made stronger by this incident, has been challenged in numerous ways. We felt our circle of friends and family shrink around us as people did not know how to react to our situation. If it were not for our faith in our heavenly father and savior we would not have survived.

I stand by my husband always

Respectfully,


Juliana M. Bermudez
Clinical Manager
International Pediatric Clinic DBA La Clinica Del Niño
Atlanta Georgia
Wife of Eduardo Montaña

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

12/29/2018

To The Honorable M. Page Kelley,

My name is Dr. Suzana Mara Montana and I am a Pediatrician in Atlanta. I am writing this on behalf of Dr. Eduardo Montana, who I have known personally and professionally since 1991. I was married to his for 13 years.

I can attest with honest confidence that Dr. Eduardo Montana is an excellent Physician with impeccable work ethics and outstanding clinical skills. In my personal opinion, it is very unlikely that Dr. Montana would purposefully act in any way that could jeopardize his medical career and reputation.

Sincerely,

Dr. Suzana Montana

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

# DAVID F. ROBERTS, P.A.
### Attorney & Counselor at Law

701 Brickell Ave., Suite 2000
Miami, Florida 33131 U.S.A.

Telephone: (305) 632-1326
Facsimile: (305) 328-9312
E-mail: DFR@bellsouth.net

January 2, 2019

Hon. M. Page Kelley
Asst. US Attorney Kriss Basil
One Courthouse Way
Boston, MA 02210

**In Re: United States vs. Eduardo Montana, MD, In the U.S. District Court, District
of Mass. FILED UNDER SEAL Crim. Complaint No. 18-1044-MPK**

Dear Honorable Judge Kelley and Attorney Basil:

Thank you for affording me the opportunity to present this letter of support on behalf of
Dr. Eduardo Montana and for devoting your valuable time and resources to its review.

Ed and I have been very close since we first met in college in 1979. We are brothers
although we are not blood related. Over the decades, together we have celebrated
family births and also grieved over deaths in our respective families. Having known him
so very well for so very long provides me with keen insight into his character, values,
ethics, beliefs, hopes, dreams as well as dreads. Ed Montana is a good man...a very
decent man. He is a selfless family man who has always gone way beyond the call of
duty to help countless others in dire need without asking for anything in return. It is a
rare and much needed human trait in such a rushed and often unforgiving world we live
in.

Ed Montana is extremely remorseful at all levels involving this most unfortunate case.
He fully realizes he made serious mistakes making rash judgements but I stand strong
in my steadfast heartfelt belief he never intended to commit serious infractions much
less any criminal offenses. Ed Montana's fiber has always been positive and true. In my
opinion, it is not 'in him" to purposely orchestrate any type of criminal action.

Knowing him so well is precisely what makes it so very difficult to condense his many
virtues unto one sheet of paper in the sincere hope it may provide guidance for the
Court's possible compassion and leniency.

When placing your necessary and weighty considerations on the scales of justice,
please consider that now, more than ever, our strained society is in true need of
selfless, decent  and helpful human beings like Ed Montana. We all make mistakes but
please note that Ed who is 56 years old, has been a model citizen his entire life. Please
have mercy on Ed Montana and consider permitting his former good name and lifetime

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

of hard work and achievement to be restored to their respectful place in our society. Ed has more than learned his lesson. I most humbly submit to your Court, that adding more punishment and imposing even more hardship than he has already comprehended, accepted and endured to date may not necessarily serve nor benefit our community. Everyone who really "knows" Ed Montana, including myself, implore you to give him a much needed and rightfully deserved second chance.

Sincerely,

David F. Roberts, (MBA,JD,MAF)

cc. Defense Counsel for Dr. Montana

## DAVID F. ROBERTS, P.A.

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9



December 30, 2018

The Honorable M. Page Kelley
US District Court Massachusetts

Dear Honorable M. Page Kelley.

It is and honour and privilege to have been asked to provide a character reference for Dr. Eduardo
Montana. I clearly understand the importance of the reference letter it comes to me with great ease to
provide it.

I have known Eduardo and his wife Juliana and his son David for years. My wife and I has been very
blessed to see his faith and Integrity while he has been dealing with this situation.

Eduardo has a deep passionate for his family, he supports all 4 of his children and wife selflessly
by always putting God and his family first in all that he does. Eduardo and his family are very giving to the
community. They have a lot of very close family and friends. My family and I have been enriched by
getting to know him and his family. Eduardo is present at David school and after school soccer and
swimming lessons and his weekend sporting events. He is committed to putting all of his children through
college.

I know him as a professional for many years with his compassion and passion to help children and people
in so many ways at the office an in the community. My life has been touch with the hope he is giving to
helping so many other people.

I sincerely hope you see the loving, giving man with deeply caring and sensitive to his family and people.
He is a very close friend like a brother to me, a real pillar to the community and a great role model to all us.
We love him for his helping spirit and love for God.

I'm praying and believing God for the best for Ed and his Juliana. They are and icon of our communities
and the world and are very good people.

If you have any questions, please feel free to contact us at any time.


Sincerely,

Dr. Les Snead
Pastor CrossPoint Church
CEO Aevolve Inc.
Office: 678-278-9557 #3
Cell: 470-445-3667
Email: Les@Aevolvetv.com

3423 Piedmont Rd NE
Atlanta, GA 30305

4132 Atlanta Highway
Suite 110-333
Loganville, Ga 30052

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9



3423 Piedmont Rd NE
Atlanta, GA 30305

4132 Atlanta Highway
Suite 110-333
Loganville, Ga 30052

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9



CHILDREN'S
PEDIATRIC CENTER
E A S T   M A I N
®

Michael G. Anderson, MD, ESQ.
391 East Main Street
Canton, Georgia 30114
Pediatrician and General Counsel – 770.720.6963

27 December 2018

c/o Kellyanne Moore
Hon. M. Page Kelley
Asst. U.S. Atty. Kriss Basil
One Courthouse Way, Boston, MA 02210

In Re: United States vs. Edwardo Montana, MD, In the U.S. Dist. Court, Dist. of Mass. FILED UNDER
       SEAL Crim. Complaint No. 18-10044-MPK

Dear Honorable Judge Kelley and Attorney Basil

        Thank you for this opportunity to share my knowledge about Edwardo Montana, MD.  For the
following reasons I plea for every possible mercy in your sentencing Dr. Montana.
        The first time I met Dr. Montana was at the bedside of a newborn struggling for life in January
2005 because Dr. Montana is an expert for newborns with heart defects.   Dr. Montana continually serves
my pediatric patients with the mercy that he seeks from this Court. Please know that many of our patient
families have desperate heart and financial challenges. Countless times I called Dr. Montana in the middle
of the night, asking him to drive to the hospital and help me with a newborn. He is generous with his time
and talent as a doctor skilled the care of pediatric heart diseases.  Candidly, although my own pediatric
training includes such newborn emergencies, only one such as with Dr. Montana's special skills for the
newborn's heart, could have been helpful.  For example, babies struggling for life may appear similarly
blue; and yet, oxygen can actually harm some newborns with certain heart conditions.  When the oxygen
question arose Dr. Montana drove to the hospital every time I called for his uncommon skills.  Dr.
Montana loves patients and provides care for everybody, even those who can least afford to pay.  He has
never turned any patient away, and gives of his skills to everyone.  Moreover, I believe that we agree that
Justice strives to ensure public's safety, protect victims' rights, and also provide the offender with
opportunities for positive change, then as a wiser citizen who returns to the community for their further
civil good civic contributions.  Thus, I believe that sentencing is perhaps more than the Federal
Sentencing Guidelines seem to reflect.  May it please the honorable Court and Assistant U.S. Attorney, I
know Dr. Montana is a pediatrician of good character, one with remorse the recently passed concerns,
benign in his intent, and now as a wiser citizen, our community needs his fast return to serve children.
        My concluding plea to the Honorable Court is that in the balance of mercy and justice we may
agree that Dr. Montana is an example of one transformed by exceptional heavenly mercy.  For this my
plea is that we may now seriously consider that exceptional earthly mercy for Dr. Montana because is
man of demonstrated good character, who has and will continue to give to others first.  Candidly, the
pediatric community, and notably my patients still need Dr. Montana to continue his highly skilled and
generous service.

                                                        Respectfully,

                                                        By Michael G. Anderson at 1:43 pm, Dec 27, 2018

cc: Defense Counsel for Dr. Montana                     Michael G. Anderson, MD, ESQ.

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9

**Hector Buitrago**
**3324 Cranmore Chase**
**Marietta Georgia 30066**

January 7, 2019

**Judge M. Page Kelley**
**United States District Court**
**District of Massachusetts**
**Attn: Kellyann Moore**

Re: Dr. Eduardo Montaña, Jr.

Honorable Judge Kelley

My wife Michele Lamassonne, who is the Executive Assistant of the Chairman of The Coca-Cola Company and I, Hector Buitrago, retired United States Federal Officer Grants Manager, who worked for EPA and CDC, know Dr. Eduardo Montaña and his family for more than 30 years. His father, Dr. Eduardo Montaña, was the Pediatrician of our three daughters.

We have celebrated many family get-togethers, birthdays, Thanksgiving and Christmas Holidays. Praying and singing with our children Christmas carols and attending Catholic masses together. Also, we had the opportunity to travel overseas on a cruise with Eduardo and his wife, and we know and share close experiences with our families.  We are very close friends with his mother and sisters too.

Dr. Eduardo Montaña is a family-oriented person, he is a very well-educated person and respects everybody.  On a professional basis, he is an outstanding physician, who cares for his patients, specializing in pediatric cardiology.

On a personal basis, I have played soccer with Eduardo for several years.  He is an excellent team player and is a pleasure to be around. I don't hesitate to recommend Dr. Eduardo Montaña for any endeavor, personally and professionally.

He is very charismatic and a philanthropist. He has helped and supported an organization, Colombianitos Foundation that my wife and I have volunteered for, to benefit more than 80,000 needy children, victims of the land mines and extreme poverty in Colombia, South America.  Dr. Montaña has helped this organization for 17 years, helping children through its signature program "Goals for a Better Life".

Honorable Judge, if you need any additional information about Dr. Eduardo Montaña, please do not hesitate to contact me at 770-403-7018.

Respectfully,

Hector Buitrago

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

December 31, 2018


To whom it may concern:


My name is Amina Montana, daughter of Eduardo Montana II. I was always a daddy's girl growing up, and my father always took great care of me when I was young. I always had the best education, because he invested in me and in my future at a young age. My father has always inspired me to bring out my creative side and channel my energy into a passion in order to change the world and find my inner peace. He always supports my craziest dreams and for that, I am so thankful. Truthfully, I do not know what I would do without him. I am writing this letter in support of him and his hard times during his trial. From someone who knows him very well, I know he is a man of great intentions and is dedicated to using medicine to making a difference. He is involved in the community, providing health care globally to underserved communities through his many projects and visions, many of which have made incredible progress. As a physician, my father has dedicated his life to helping others through medicine. No doctor is perfect, but I can say with confidence that his intention have only been for the greater good. He has always been there for my brothers and I, and I am so proud of who he has become and the things he does on a daily basis that change the world, one patient at a time.

Thanks for reading,

Amina Mara Montana

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9

December 31st, 2018

Honorable Massachusetts District Judge:

I feel both honored and privileged to write on behalf of my brother, Dr. Eduardo
Montana Jr. Ed, as we called him growing up, is my younger brother by 18 months.
We grew up very close and shared many hobbies as well as friends. Ed was always
viewed by me and his peers as a very loving and caring individual. He was very
dedicated to his friends and family as he is to this day.

 Growing up under the guidance of our Dad, who was a pediatrician, Ed began to
aspire to become a physician as well. I always knew he had the dedication and
integrity to be a wonderful physician. He has been practicing medicine since
finishing medical school in the 80"s. I have heard from many of his patients as to his
genuine bedside manner and his resolve to providing them with superior medical
care.

Ed is a very dedicated family man and father. He has spent most of his adult
weekends with his children coaching sports and being a Boy Scout leader. As my
brother, Ed has always been there for me supporting and encouraging me. He is
always available to me for any of my needs or the needs of my children.

I feel truly blessed to be able to call myself Ed's sister. I am proud to stand by his
ethical and moral standards, and his dedication to his patients.

Sincerely,

Pati Montana Fabian

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

**Villalobos, Millie**

| | |
|---|---|
| **From:** | Justin_Prophet@map.uscourts.gov |
| **Sent:** | Thursday, December 20, 2018 8:52 AM |
| **To:** | Miller, Ashley; kriss.basil@usdoj.gov |
| **Subject:** | Eduardo Montana Dkt. 18-cr-10044 Update |

All concerned,

Eduardo Montana commenced pretrial supervision on 2/28/18. Probation staff in the Northern District of Georgia have provided direct supervision of Mr. Montana To date, Mr. Montana has incurred no known issues of non-compliance. Please contact me with any questions or concerns. Have a great day and happy holidays to all.


Please confirm receipt. My apologies if you have received this message several times. I keep getting it returned to sender.

Justin Prophet
U.S. Probation Officer
District of Massachusetts
Cell- 617.571.7509
Fax- 617.790.0181

CONFIDENTIALITY NOTE: The information contained in this email and any attachment to it is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521 and is legally privileged. It is intended for the sole use of the intended recipient(s). If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this transmission in error, please immediately reply to the sender that you have received this communication in error and then delete it. Thank you.

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

**Miller, Ashley**

| | |
|---|---|
| **From:** | steven_witherspoon@ganp.uscourts.gov |
| **Sent:** | Wednesday, December 19, 2018 7:35 PM |
| **To:** | Miller, Ashley |
| **Subject:** | Re: Dr. Eduardo Montana Supervision |

Good Evening,

Mr. Montana has been compliant under supervision thus far. There has not been any violations reported to the court. Thank you.

Steven Witherspoon
U.S. Probation Officer
Pretrial Services Unit
Northern District of Georgia
404-215-1938

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

# Exhibit 29

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*



**Children's Cardiovascular Medicine P.C**

**Eduardo Montana Jr., M.D., MPH**

780 Canton Road, NE, Suite 350
Marietta, GA 30060
Fax: (404) 943-9787
Phone: (404) 943-0289

Children's Cardiovascular Medicine P.C

### PATIENT CONSENT FOR
### USE AND DISCLOSURE OF PROTECTED HEALTH
### INFORMATION

With my consent, **Children's Cardiovascular Medicine** may use and disclose protected Health Information (PHI)about me to carry out treatment, payment and healthcare operations (TPO). Please refer to **Children's Cardiovascular Medicine**'s Notice of Privacy Practices for a more complete description of such uses and disclosures.

I have the right to review the Notice of Privacy Practices prior to signing this consent. Children's Cardiovascular Medicine reserves the right to revise its Notice of Privacy practices at anytime.
A revised Notice of Privacy practices may be obtained by forwarding a written request to **Children's Cardiovascular Medicine**, Privacy Officer at 61Witcher St., Suite 4140, Marietta, Georgia 30060.

With my consent, **Children's Cardiovascular Medicine** may call my home or other designated location and leave a message on voice mail or in person in reference to any items and any call pertaining to my clinical care, including laboratory results among others.

With my consent, **Children's Cardiovascular Medicine** may mail to my home or other designated location any items that assist the practice in carrying out TPO, such as appointment cards and patient statements as long as they are marked Personal and Confidential.

With my consent, **Children's Cardiovascular Medicine** may e-mail my appointment reminder cards and patient statements. I have the right to request that Children's Cardiovascular Medicine restrict how it uses or discloses my PHI to carry out TPO. However, the practice is not required to agree to my requested restrictions, but if it does, it is bounded by this agreement.

By signing this form, I am consenting to **Children's Cardiovascular Medicine**'s use and disclose of my PHI to carry out TPO.

I may revoke my consent in writing except that the practice has already made disclosures in reliance upon my prior consent. If I do not sign this consent, **Children's Cardiovascular Medicine** may decline to provide treatment to me.

_Susan L. Jain_                                      _3/13/13_
Signature of Patient /Parent or Legal Guardian          Date

_Maya Jain_
Patient's Name

_Susan Jain_
Print Name of Parent or Legal Guardian

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

# Children's Cardiovascular Medicine P.C

**Eduardo Montana Jr., M.D., MPH**

**780 Canton Road, NE, Suite 350
Marietta, GA 30060
Fax: (404) 943-9787
Phone: (404) 943-0289**

 COMPASS

## PATIENT CONSENT FORM

**To be read, completed, and signed by patient or patient's personal representative.
Please FAX immediately to the COMPASS Program at 1-855-898-2498.**

By signing this Authorization, I authorize my physician, pharmacies, other health care providers, my health insurance company, other third party payers, and third party alternate funding sources, on my behalf, to use and/or disclose my personal health information, including but not limited to my name, social security number, medical and pharmacy records, information relating to my medical condition, treatment, and health insurance, as well as all information provided on any prescription to Aegerion Pharmaceuticals, Inc. and its subsidiaries and affiliates, contractors, employees, agents and successors (collectively, "Aegerion"), and the COMPASS Program and its contractors and other entities that provide services for the COMPASS Program and their respective successors and assigns (collectively, the "Companies"), along with the Companies' employees and agents, as set forth below.

The Companies are authorized to use and/or disclose my personal health information in order to provide me with the education, information, support and other services provided by the COMPASS Program, including, but not limited to:

- investigating insurance coverage;
- fulfilling and coordinating delivery of Aegerion's product(s) (which includes forwarding my personal health information to a pharmacy) and nutritional supplements;
- investigating financial support services and programs, or comparable programs, that may be relevant for my medical condition;
- for purposes of treatment, claims adjudication, submission of claims to third party payers for payment;
- communicating with me, my physician, other healthcare providers, and insurance carriers;
- other educational and treatment support services and information, including product materials and information, and treatment and medication reminders;
- facilitating access and awareness of the services and other programs related to my medical condition;
- providing nutritional support and counseling; and
- conducting surveys to evaluate the effectiveness of the COMPASS Program.

The Companies are authorized to contact me by mail, e-mail, text, telephone, and/or any alternative communication method that I request for any such purposes.

Once my health information has been disclosed to the Companies, I understand that federal privacy laws may no longer protect the information. However, the Companies agree to protect my personal health information by using and disclosing it only for the purposes described in this Authorization or as otherwise authorized by law.

I understand that I may refuse to sign this Authorization, and that doing so will not affect my ability to receive treatment with Aegerion's product or obtain insurance or insurance benefits. I also understand that by refusing to sign this Authorization, I will not be able to enroll in the COMPASS Program.

I understand that I am entitled to a copy of this Authorization, and that I may cancel this Authorization at any time, by mailing a letter requesting such cancellation to: COMPASS Program; 17877 Chesterfield Airport Road; Chesterfield, MO 63005.

I understand that the cancellation shall be effective upon actual receipt of my letter by the Companies. Canceling this Authorization will end further use and disclosure of my health information as authorized above after the date that the Companies receive my letter, but will not affect health information that has already been used or disclosed in reliance upon this Authorization.

This Authorization expires ten (10) years from the date this Authorization is signed.

**Agreed:**

Patient Signature:                                                  Date: *15 March 2013*

Patient Name (Print):

Personal Representative (if applicable): *Susan W... Jr Maya Jain*

Personal Representative's Printed Name: *Susan W Jain*

Relationship to Patient, including the authority for status as Personal Representative:

Address of Patient or Personal Representative:

Telephone number:

*Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9*

# Exhibit 30

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

AO 245B (Rev. 02/18)   Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

District of Massachusetts

| UNITED STATES OF AMERICA | ) | JUDGMENT IN A CRIMINAL CASE |
|---|---|---|
| v. | ) | |
| | ) | Case Number:  1:18-cr-10044-MPK |
| | ) | USM Number:  00803-138 |
| Eduardo Montaña | ) | T.C. Spencer Pryor |
| | ) | Defendant's Attorney |

## THE DEFENDANT:

☑ pleaded guilty to count(s)    1

☐ pleaded nolo contendere to count(s)
which was accepted by the court.

☐ was found guilty on count(s)
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 42:1320d-6 | Wrongful Disclosure of Individually Identifiable Health Information | 3/31/2013 | 1 |

The defendant is sentenced as provided in pages 2 through __5__ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

1/14/2019
Date of Imposition of Judgment

_Pa. Kelley_
Signature of Judge

M. Page Kelley, United States Magistrate Judge
Name and Title of Judge

Date   _January  15, 2019_

Confidential & Personal Information-FOIA Exempt
OI File Number 1-13-40167-9

AO 245B (Rev. 02/18) Judgment in a Criminal Case
Sheet 4—Probation

| | Judgment—Page _2_ of _5_ |
|---|---|

DEFENDANT:     Eduardo Montaña
CASE NUMBER:   1:18-cr-10044-MPK

## PROBATION

You are hereby sentenced to probation for a term of:

Six months

## MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of placement on probation and at least two periodic drug tests thereafter, as determined by the court.
    ☑ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4. ☐ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
5. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
6. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*
7. ☐ You must make restitution in accordance with 18 U.S.C. §§ 2248, 2259, 2264, 2327, 3663, 3663A, and 3664. *(check if applicable)*
8. You must pay the assessment imposed in accordance with 18 U.S.C. § 3013.
9. If this judgment imposes a fine, you must pay in accordance with the Schedule of Payments sheet of this judgment.
10. You must notify the court of any material change in your economic circumstances that might affect your ability to pay restitution, fines, or special assessments.

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

AO 245B (Rev. 02/18)   Judgment in a Criminal Case
Sheet 4A — Probation

| | | Judgment—Page | 3 | of | 5 |

DEFENDANT:   Eduardo Montaña
CASE NUMBER: 1:18-cr-10044-MPK

## STANDARD CONDITIONS OF SUPERVISION

As part of your probation, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of the time you were sentenced, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must notify the probation office prior to any travel. Defendant is permitted to travel internationally.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

### U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____      Date _____

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

AO 245B (Rev. 02/18)   Judgment in a Criminal Case
  Sheet 5 — Criminal Monetary Penalties

|  |  |
|---|---|
| DEFENDANT:  Eduardo Montaña | Judgment — Page  4  of  5 |
| CASE NUMBER: 1:18-cr-10044-MPK | |

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | JVTA Assessment* | Fine | Restitution |
|---|---|---|---|---|
| TOTALS | $ 25.00 | $ | $ 5,000.00 | $ |

☐  The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐  The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
| TOTALS | $            0.00 | $            0.00 | |

☐  Restitution amount ordered pursuant to plea agreement  $ _____

☐  The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐  The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐  the interest requirement is waived for the   ☐ fine   ☐ restitution.

    ☐  the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

Case 1:18-cr-10044-MPK   Document 29   Filed 01/15/19   Page 5 of 5

AO 245B  (Rev. 02/18) Judgment in a Criminal Case
          Sheet 6 — Schedule of Payments

DEFENDANT:   Eduardo Montaña                                       Judgment — Page   5   of   5
CASE NUMBER:  1:18-cr-10044-MPK

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A  ☑  Lump sum payment of $ ___5,000.00___  due immediately, balance due

    ☐  not later than _____ , or
    ☐  in accordance with ☐ C,  ☐ D,  ☐ E, or  ☐ F below; or

B  ☐  Payment to begin immediately (may be combined with   ☐ C,   ☐ D, or   ☐ F below); or

C  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
    _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

D  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
    _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a
    term of supervision; or

E  ☐  Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from
    imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F  ☐  Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

    Defendant and Co-Defendant Names and Case Numbers *(including defendant number)*, Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) JVTA assessment, (8) penalties, and (9) costs, including cost of prosecution and court costs.

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

Case 1:18-cr-10044-MPK   Document 29-1   Filed 01/15/19   Page 1 of 4

AO 245B (Rev. 02/18)   Judgment in a Criminal Case
Attachment (Page 1) — Statement of Reasons

DEFENDANT:      Eduardo Montaña
CASE NUMBER:   1:18-cr-10044-MPK
DISTRICT:       District of Massachusetts

# STATEMENT OF REASONS
### (Not for Public Disclosure)
*Sections I, II, III, IV, and VII of the Statement of Reasons form must be completed in all felony and Class A misdemeanor cases.*

**I.   COURT FINDINGS ON PRESENTENCE INVESTIGATION REPORT**

A. ☐   The court adopts the presentence investigation report without change.

B. ☑   **The court adopts the presentence investigation report with the following changes.** *(Use Section VIII if necessary)*
*(Check all that apply and specify court determination, findings, or comments, referencing paragraph numbers in the presentence report.)*

   1. ☐   **Chapter Two** of the United States Sentencing Commission <u>Guidelines Manual</u> determinations by court: *(briefly summarize the changes, including changes to base offense level, or specific offense characteristics)*

   2. ☐   **Chapter Three** of the United States Sentencing Commission <u>Guidelines Manual</u> determinations by court: *(briefly summarize the changes, including changes to victim-related adjustments, role in the offense, obstruction of justice, multiple counts, or acceptance of responsibility)*

   3. ☑   **Chapter Four** of the United States Sentencing Commission <u>Guidelines Manual</u> determinations by court: *(briefly summarize the changes, including changes to criminal history category or scores, career offender status, or criminal livelihood determinations)*
       Court finds the Base Offense Level is six and that the three level enhancement does not apply.

   4. ☐   **Additional Comments or Findings:** *(include comments or factual findings concerning any information in the presentence report, including information that the Federal Bureau of Prisons may rely on when it makes inmate classification, designation, or programming decisions; any other rulings on disputed portions of the presentence investigation report; identification of those portions of the report in dispute but for which a court determination is unnecessary because the matter will not affect sentencing or the court will not consider it)*

C. ☐   The record establishes no need for a presentence investigation report pursuant to Fed.R.Crim.P. 32.
     Applicable Sentencing Guideline: *(if more than one guideline applies, list the guideline producing the highest offense level)* _____

**II.   COURT FINDING ON MANDATORY MINIMUM SENTENCE** *(Check all that apply)*

A. ☐   One or more counts of conviction carry a mandatory minimum term of imprisonment and the sentence imposed is at or above the applicable mandatory minimum term.

B. ☐   One or more counts of conviction carry a mandatory minimum term of imprisonment, but the sentence imposed is below a mandatory minimum term because the court has determined that the mandatory minimum term does not apply based on:

   ☐   findings of fact in this case: *(Specify)*

   ☐   substantial assistance (18 U.S.C. § 3553(e))
   ☐   the statutory safety valve (18 U.S.C. § 3553(f))

C. ☑   No count of conviction carries a mandatory minimum sentence.

**III.   COURT DETERMINATION OF GUIDELINE RANGE:** *(BEFORE DEPARTURES OR VARIANCES)*

Total Offense Level:   6
Criminal History Category:   I
Guideline Range: *(after application of §5G1.1 and §5G1.2)*   0   to   6   months
Supervised Release Range:   0   to   1   years
Fine Range: $  500   to $  9,500

☐   Fine waived or below the guideline range because of inability to pay.

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

| AO 245B (Rev. 02/18)   Judgment in a Criminal Case Attachment (Page 2) — Statement of Reasons | Not for Public Disclosure |
|---|---|

DEFENDANT:   Eduardo Montaña
CASE NUMBER:   1:18-cr-10044-MPK
DISTRICT:      District of Massachusetts

# STATEMENT OF REASONS

**IV.   GUIDELINE SENTENCING DETERMINATION** *(Check all that apply)*

    A.  ☑  The sentence is within the guideline range and the difference between the maximum and minimum of the guideline range does not exceed 24 months.

    B.  ☐  The sentence is within the guideline range and the difference between the maximum and minimum of the guideline range exceeds 24 months, and the specific sentence is imposed for these reasons: *(Use Section VIII if necessary)*

    C.  ☐  The court departs from the guideline range for one or more reasons provided in the Guidelines Manual. *(Also complete Section V.)*

    D.  ☐  The court imposed a sentence otherwise outside the sentencing guideline system (i.e., a variance). *(Also complete Section VI)*

**V.   DEPARTURES PURSUANT TO THE GUIDELINES MANUAL** *(If applicable)*

    A.  The sentence imposed departs: *(Check only one)*
        ☐  above the guideline range
        ☐  below the guideline range

    B.  Motion for departure before the court pursuant to: *(Check all that apply and specify reason(s) in sections C and D)*
        1.    **Plea Agreement**
            ☐  binding plea agreement for departure accepted by the court
            ☐  plea agreement for departure, which the court finds to be reasonable
            ☐  plea agreement that states that the government will not oppose a defense departure motion.
        2.    **Motion Not Addressed in a Plea Agreement**
            ☐  government motion for departure
            ☐  defense motion for departure to which the government did not object
            ☐  defense motion for departure to which the government objected
            ☐  joint motion by both parties
        3.    **Other**
            ☐  Other than a plea agreement or motion by the parties for departure

    C.  Reasons for departure: *(Check all that apply)*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ☐ | 4A1.3 | Criminal History Inadequacy | ☐ | 5K2.1 | Death | ☐ 5K2.12 | Coercion and Duress |
| ☐ | 5H1.1 | Age | ☐ | 5K2.2 | Physical Injury | ☐ 5K2.13 | Diminished Capacity |
| ☐ | 5H1.2 | Education and Vocational Skills | ☐ | 5K2.3 | Extreme Psychological Injury | ☐ 5K2.14 | Public Welfare |
| ☐ | 5H1.3 | Mental and Emotional Condition | ☐ | 5K2.4 | Abduction or Unlawful Restraint | ☐ 5K2.16 | Voluntary Disclosure of Offense |
| ☐ | 5H1.4 | Physical Condition | ☐ | 5K2.5 | Property Damage or Loss | ☐ 5K2.17 | High-Capacity, Semiautomatic Weapon |
| ☐ | 5H1.5 | Employment Record | ☐ | 5K2.6 | Weapon | ☐ 5K2.18 | Violent Street Gang |
| ☐ | 5H1.6 | Family Ties and Responsibilities | ☐ | 5K2.7 | Disruption of Government Function | ☐ 5K2.20 | Aberrant Behavior |
| ☐ | 5H1.11 | Military Service | ☐ | 5K2.8 | Extreme Conduct | ☐ 5K2.21 | Dismissed and Uncharged Conduct |
| ☐ | 5H1.11 | Charitable Service/Good Works | ☐ | 5K2.9 | Criminal Purpose | ☐ 5K2.22 | Sex Offender Characteristics |
| ☐ | 5K1.1 | Substantial Assistance | ☐ | 5K2.10 | Victim's Conduct | ☐ 5K2.23 | Discharged Terms of Imprisonment |
| ☐ | 5K2.0 | Aggravating/Mitigating Circumstances | ☐ | 5K2.11 | Lesser Harm | ☐ 5K2.24 | Unauthorized Insignia |
| | | | | | | ☐ 5K3.1 | Early Disposition Program (EDP) |

    ☐  Other Guideline Reason(s) for Departure, to include departures pursuant to the commentary in the Guidelines Manual: *(see "List of Departure Provisions" following the Index in the Guidelines Manual.) (Please specify)*

    D.  State the basis for the departure. *(Use Section VIII if necessary)*

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

| AO 245B (Rev. 02/18) | Judgment in a Criminal Case<br>Attachment (Page 3) — Statement of Reasons | Not for Public Disclosure |
|---|---|---|

DEFENDANT:   Eduardo Montaña
CASE NUMBER: 1:18-cr-10044-MPK
DISTRICT:    District of Massachusetts

# STATEMENT OF REASONS

**VI.   COURT DETERMINATION FOR A VARIANCE** *(If applicable)*

**A.   The sentence imposed is:** *(Check only one)*
☐ above the guideline range
☐ below the guideline range

**B.   Motion for a variance before the court pursuant to:** *(Check all that apply and specify reason(s) in sections C and D)*
1.   **Plea Agreement**
☐ binding plea agreement for a variance accepted by the court
☐ plea agreement for a variance, which the court finds to be reasonable
☐ plea agreement that states that the government will not oppose a defense motion for a variance
2.   **Motion Not Addressed in a Plea Agreement**
☐ government motion for a variance
☐ defense motion for a variance to which the government did not object
☐ defense motion for a variance to which the government objected
☐ joint motion by both parties
3.   **Other**
☐ Other than a plea agreement or motion by the parties for a variance

**C.   18 U.S.C. § 3553(a) and other reason(s) for a variance** *(Check all that apply)*
☐ The nature and circumstances of the offense pursuant to 18 U.S.C. § 3553(a)(1)
   ☐ Mens Rea          ☐ Extreme Conduct          ☐ Dismissed/Uncharged Conduct
   ☐ Role in the Offense     ☐ Victim Impact
   ☐ General Aggravating or Mitigating Factors *(Specify)*
☐ The history and characteristics of the defendant pursuant to 18 U.S.C. § 3553(a)(1)
   ☐ Aberrant Behavior        ☐ Lack of Youthful Guidance
   ☐ Age              ☐ Mental and Emotional Condition
   ☐ Charitable Service/Good    ☐ Military Service
      Works
   ☐ Community Ties        ☐ Non-Violent Offender
   ☐ Diminished Capacity      ☐ Physical Condition
   ☐ Drug or Alcohol Dependence  ☐ Pre-sentence Rehabilitation
   ☐ Employment Record      ☐ Remorse/Lack of Remorse
   ☐ Family Ties and        ☐ Other: (Specify)
      Responsibilities
   ☐ Issues with Criminal History: *(Specify)*
☐ To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense
   (18 U.S.C. § 3553(a)(2)(A))
☐ To afford adequate deterrence to criminal conduct (18 U.S.C. § 3553(a)(2)(B))
☐ To protect the public from further crimes of the defendant (18 U.S.C. § 3553(a)(2)(C))
☐ To provide the defendant with needed educational or vocational training (18 U.S.C. § 3553(a)(2)(D))
☐ To provide the defendant with medical care (18 U.S.C. § 3553(a)(2)(D))
☐ To provide the defendant with other correctional treatment in the most effective manner (18 U.S.C. § 3553(a)(2)(D))
☐ To avoid unwarranted sentencing disparities among defendants (18 U.S.C. § 3553(a)(6)) (Specify in section D)
☐ To provide restitution to any victims of the offense (18 U.S.C. § 3553(a)(7))
☐ Acceptance of Responsibility    ☐ Conduct Pre-trial/On Bond   ☐ Cooperation Without Government Motion for
☐ Early Plea Agreement       ☐ Global Plea Agreement        Departure
☐ Time Served *(not counted in sentence)*   ☐ Waiver of Indictment   ☐ Waiver of Appeal
☐ Policy Disagreement with the Guidelines *(Kimbrough v. U.S., 552 U.S. 85 (2007): (Specify)*

☐ Other: (Specify) _____

**D.   State the basis for a variance. (Use Section VIII if necessary)**

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*

AO 245B (Rev. 02/18)    Judgment in a Criminal Case
                        Attachment (Page 4) — Statement of Reasons                                      Not for Public Disclosure

DEFENDANT:     Eduardo Montaña
CASE NUMBER:   1:18-cr-10044-MPK
DISTRICT:      District of Massachusetts

## STATEMENT OF REASONS

**VII.   COURT DETERMINATIONS OF RESTITUTION**

A. ☑  **Restitution Not Applicable.**

B.  **Total Amount of Restitution: $** _____

C.  **Restitution not ordered:** *(Check only one)*

1. ☐  For offenses for which restitution is otherwise mandatory under 18 U.S.C. § 3663A, restitution is not ordered because the number of identifiable victims is so large as to make restitution impracticable under 18 U.S.C. § 3663A(c)(3)(A).

2. ☐  For offenses for which restitution is otherwise mandatory under 18 U.S.C. § 3663A, restitution is not ordered because determining complex issues of fact and relating them to the cause or amount of the victims' losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim would be outweighed by the burden on the sentencing process under 18 U.S.C. § 3663A(c)(3)(B).

3. ☐  For other offenses for which restitution is authorized under 18 U.S.C. § 3663 and/or required by the sentencing guidelines, restitution is not ordered because the complication and prolongation of the sentencing process resulting from the fashioning of a restitution order outweigh the need to provide restitution to any victims under 18 U.S.C. § 3663(a)(1)(B)(ii).

4. ☐  For offenses for which restitution is otherwise mandatory under 18 U.S.C. §§ 1593, 2248, 2259, 2264, 2327 or 3663A, restitution is not ordered because the victim(s)'(s) losses were not ascertainable (18 U.S.C. § 3664(d)(5)).

5. ☐  For offenses for which restitution is otherwise mandatory under 18 U.S.C. §§ 1593, 2248, 2259, 2264, 2327 or 3663A, restitution is not ordered because the victim(s) elected to not participate in any phase of determining the restitution order (18 U.S.C. § 3664(g)(1)).

6. ☐  Restitution is not ordered for other reasons. *(Explain)*

D. ☐  **Partial restitution is ordered for these reasons** *(18 U.S.C. § 3553(c))*:

**VIII.  ADDITIONAL BASIS FOR THE SENTENCE IN THIS CASE** *(if applicable)*

Defendant's Soc. Sec. No.:     ▦8502

Defendant's Date of Birth:     ▦1962

Defendant's Residence Address:  Northeast Atlanta, Georgia ▦

Defendant's Mailing Address:    Northeast Atlanta, Georgia ▦

Date of Imposition of Judgment
1/14/2019

*Pay Kelley*
Signature of Judge

M. Page Kelley, United States Magistrate Judge
Name and Title of Judge

Date Signed   *January 15, 2019*

*Confidential & Personal Information-FOIA Exempt*
*OI File Number 1-13-40167-9*